Sneed, J.,
delivered the opinion of the Court.
The defendants were, on the 17th of February, 1862, citizens of the city of Clarksville, and were present and participated in the proceedings of a public meeting of the citizens of said city, convened at the Mayor’s office on that day. The meeting was called to concert measures for the protection of the people of said city in anticipation of an immediate invasion by the Federal forces, to whom Fort Donel-son, which seems to have been regarded as the military key to Clarksville, had surrendered on the day preceding. The city of Clarksville was about thirty miles distant from Fort Donelson, and the occupation of the city was expected as the immediate result of the capitulation of the fort. There was at the time in the hands of merchants and dealers in the city a large quantity of whisky and other spirituous liquors, which it was supposed would imperil the lives and property of the inhabitants if it should fall into the hands of the Federal soldiery, then flushed with victory and inflamed with the evil passions of civil' war. It was therefore resolved by the citizens^ convened as aforesaid, to destroy said spirituous liquors, as a measure of safety, and to recommend to the common council of said city, and to the county authorities, to levy a special tax upon the people in' order to raise a fund for the reimbursement of' those whose property should *101 be thus destroyed. To this end agents were appointed to advise the owners of the resolution aforesaid, to invoke their acquiescence, and to carry out the objects of the meeting. The plaintiff was the owner of a considerable quantity of whisky, brandy, and wine stored in said city, and he was called upon by one'' of the agents, who advised him of the action of the meeting, and he thereupon delivered his key to his salesman, with instructions to deliver the liquors to the agent, by whom it was destroyed.
This action was brought by the plaintiff on the 9th of March, 1866, to recover of defendants, who were among the citizens composing said meeting, the value of- the liquors so destroyed The cause was submitted to a jury on the general issue and the' defendants’ special plea of public necessity, and resulted in a verdict and judgment for the defendants, from which the plaintiff has appealed in error.
The record does not inform us whether the common council and the county authorities took any action to repair the. mischief, or whether the interposition of either was ever invoked according to promise.
It appears from the proof that the meeting at the the Mayor’s office was very generally attended by the citizens. The agent who destroyed the plaintiff’s liquor- states that the office was crowded and that a large number of citizens were standing in front of it unable to gain admittance. The plaintiff asked' the witness for what purpose the meeting had been assembled, and he explained to plaintiff the object thereof. At a later hour in the day he met the plaintiff and *102 advised him of the resolution adopted by the meeting, and that he, the witness, had been appointed one of the agents for the destruction of the liquors. That he was directed to call upon the owners and ask their consent to the measure, and that the mayor and ai-definen, and the county court, would be called upon to “remunerate the owners,” and that with a view to such ultimate payment he was instructed to take an accurate account of all the liquors destroyed. The plaintiff thereupon gave the key of his house to one Hibbs, who accompanied witness to the store, where the liquors were poured out, after, taking an account of the quality and quantity thereof. The defendants, McKenzie, Williams, and Wisdom, were also appointed by the meeting as agents for the destruction of liquors, and to advise the owners of the action of the meeting. The plaintiff asked the witness what took place at other houses where and while the liquors of other . citizens were being destroyed. To this course of examination the defendants objected; and the testimony was ruled inadmissible. The witness did not tell the plaintiff that the meeting had directed its agents to .use force in the destruction of the liquors, but that he, with others, had been appointed to wait upon the owners and request them to permit it to be done, and to assure the owners that they would be paid for the loss of their property. The testimony shows also that there was at the time great excitement in the community and much apprehension that _ the Federal troops upon their expected arrival from the fort would seize the liquors, and becoming intoxicated com *103 mit depredations upon the inhabitants and their property, and it is shown from the plaintiff’s testimony that no one was forbidden to remove his liquors to some place of security outside of the town. The plaintiff proposed to prove by his clerk Hibbs what was said to him by the agent at the time the liquors were being poured out, as to the action and orders of the meeting. This testimony was objected to by the defendants, and was excluded by the court. It was fully shown by other witnesses' that the plan agreed upon by the citizens was, that the corporate authorities were to be requested to destroy the liquors, and the ¿citizens agreed to suffer the imposition of a special tax to refund the value thereof to the owners. There is testimony to the effect that some of the defendants who were acting as agents in the destruction of the property had said to some of the owners in the presence of the witness Duff that the liquors would be destroyed whether the owners were willing or not, and that threats were resorted to in accomplishing that purpose, but this is denied by the witness Duff. It is also shown by one witness that an attempt of one of the owners to remove his liquor from the town was prevented by the order of some of the defendants, who directed the witness Leonard to seize and destroy the liquor so attempted to be removed. But the witness Leonard who is interrogated touching this tranction, states that he has no recollection of any such orders or any such action. It does affirmatively appear, however, from the testimony of the witness Duff, that he advised some one of the parties to re *104 move his liquors to some place of security outside of the town.
The plaintiff introduced George Alwell as a witness, who being examined on the voir dire stated that he had brought his action against defendants to recover the value of his own liquors destroyed on the same day, and that his action, was still pending and undetermined. That several other similar suits were now pending, and that all the plaintiffs in said action, the plaintiff in this ■ action, and himself among them, had agreed upon a fee in gross to be paid the attorneys for their services in prosecuting these several suits, each to pay his proportionate part of the fee, a part of which had already been paid. That he intended to continue the prosecution of his own suit whether the plaintiff succeeded or not, and that the result of the present action might have some bearing upon the fate of his own. The defendants thereupon objected to the witness as incompetent, upon the ground that he was interested in the result, and insisted for reasons of public policy he should be excluded. The court ruled that the witness was incompetent. It is proper to observe that the trial of this action was on 30th of September, 1868, and prior to the act of December, 1868, which makes operative a prior act removing the disqualification of interest in the subject matter of the suit. Vide acts 1868, ch. 75, and 1868, ch. 7, Shank. Supp., 264. It seems that during the progress of the trial it came to the knowledge of the plaintiff that the Judge presiding attended the meeting of the citizens of Clarksville, out of *105 whose action this litigation has grown. The incompetency of his Honor was thereupon suggested by the plaintiff’s counsel. The Judge responded that he believed he was present at the meeting, but he took no part in its proceedings, and thereupon ruled himself competent, and overruled the exception.
After the general charge of the court to the jury had been delivered, the plaintiff asked the- court to charge as follows: that to authorize the destruction of property on the ground of public necessity, the danger must be so imminent and immediate, and the public safety so directly imperiled, that it is an absolute and unconditional necessity to destroy the property, and that this fact must be proved by the defendants, and must not have its origin in vague fears and unsus-tained apprehension. The court, in response, instructed the jury as follows: “If it appears the destruction of the whisky was done under the belief that if; was necessary to the safety of the public, that is a question resting with you from the proof. Whether that the danger was imminent and impending, or ' that the citizens had reasonable grounds to believe that the destruction of the property was necessary for the public safety, to ascertain that you will look to the proof. In arriving at your conclusion on this point you will look to the state and condition of the country, the fall of Fort Donelson, the advance of the hostile forces, the nature of the property destroyed, its effects upon ' men, and the consequences that might result from permitting it to fall into the hands of hostile forces. All these facts you may look to, and *106 if you are satisfied that the danger was imminent and impending, and the destruction of the property a public necessity for the safety of the public, then the defendants were justified in its destruction. But you must be satisfied from the proof that the danger was pending and imminent to authorize the destruction. It must not be imaginary, but real danger to the public, as stated.”
We have thus referred to so much of the testimony and ruling of the court in the progress of the cause as is necessary to present the more important questions relied upon by the plaintiff as grounds for the reversal of the judgment, and we propose to consider each in its order as herein presented, premising that the general principles which control some of the questions will necessarily settle others of like import not herein specifically referred to.
Itt is answered in argument that the doctrine of the law of evidence, that where a common purpose to do a wrongful act is shown to exist on the part of several tort feasors, the acts and declarations of each done or spoken in the execution of the common purpose are admissable in evidence against each, has no application to this case, for the reason that the common purpose was not in itself unlawful. The theory of the defense is, that it was not unlawful to destroy the property of the plaintiff, because of the exigent public necessity which demanded its destruction.
But the motives actuating the defendant, and the public necessity for their action, could alone determine the lawfulness or unlawfulness of the act, and those *107 motives could only be ascertained and understood by the acts and declarations of the defendants at the time of the combination to do the act, and during the progress of its performance. It will be observed that the declaration contained two counts, the one in trover and the other in trespass. The combination to destroy all the property of a like description in the city of Clarksville, being first distinctly shown, everything done or said by defendants, or their accredited agent, in the prosecution of the common design, tended necessarily to illustrate the motive and intention of each separate act. It was not a combination to destroy the property of the plaintiff alone, but all property of a like description, and for a like purpose. The unity of design embraced the whole, as well as every part thereof, and the res gestae was integral and not severable, and was made up of all that was said and done in the execution of the common purposes.
The cry of the mob in Lord George Gordon’s case is a notable illustration of this doctrine, where the purpose of the evidence was to show the character of the principal fact: 21 How. State Trials, 542. The connection of the defendants being first shown, every act and declaration, says Greenleaf, of each member of the confederacy, in pursuance of the original concocted plan, and with reference to the common object, is in contemplation of law the act and declaration of all, and is therefore original evidence against each of them. Every one who enters into a common purpose or design is generally deemed in law a party to every act which has before been done, and to every *108 act which afterwards may be done, by any of the others in furtherance of the common design: 1 Green’]. Ev., s. 111; and here also, says the same author, it must be observed that the acts and declarations thus admitted, must be those' only which were done and made during the pendency of the criminal enterprise and in furtherance of its objects. If they took place at a subsequent period, and are therefore merely narrative of past occurrences, they are to be rejected: Id. 111. They must be consistent with the principal act, and so connected with it as to be regarded • as the mere result and consequence of the co-existing motives, in order to form a proper criterion for directing the judgment which is to be formed upon the whole conduct: Id. 110. Thus, also, the acts and declarations of an agent, if directly connected with, and constituting a part of, the transaction for which it is sought to hold the principal liable, are admissible in evidence against the principal: Cobb v. Johnson, 2 Sneed, 73. Tested by these principles we think there was error in the rejection of the testimony as to what was said and done by the agent of the defendants at the time of the destruction of the plaintiff’s property, as to the action and orders of the defendants, and what was said and done by the defendants or their agents on the same subject at other points when the common purpose of the defendants was being accomplished. The fact that the plaintiff has brought his separate action without uniting with others, cannot vary the application of the principle, as everything done in the execution of the common design was a part of the *109 res gestae, and reflected the motives of the defendants, as well in the destruction of the property of the plaintiff, as in that of the other citizen^, destroyed as part of the same transaction.
The testimony might have been of vital importance to the plaintiff, in view of the assumption on the part of the defense that the plaintiff freely and voluntarily consented to the destruction of his property. ’ If this be true, he certainly has no right of action against these defendants: 1 Hill, on Torts, 143, 167. If it be true, as alleged, that threats of violence were used in carrying out the purpose of the defendants, such testimony would tend to explain the motive influencing the plaintiff in his alleged acquiescence in the destruction of his property.
The witness Alwell had no direct interest in the result of the plaintiff’s action, but only in the question to be adjudicated. This did not render him incompetent. The tendency of modern judicial ruling, as well as legislation, is to resolve all such questions into one of credit, and while our own legislation has now rendered the settlement of the question of but little practical importance, yet the exclusion of the witness at the time was improper. The rule is thus stated: “ The disqualifying interest of the witness must be in the event of the cause itself, and not in the question to be decided. His liability to a like action,, or his standing in the same predicament with the party, if the verdict can not be given in evidence for or against him, is an interest in the question only, and does not exclude him:” Greenl. Ev., s. 386, et seq.; Id. ss. 408, 409.
*110 We are not prepared to say that the Circuit Judge who presided at the trial of this cause had such an interest in the result as disqualified him from sitting in judgment upon it. The Constitution of this State provides that no judge of the Supreme or inferior courts shall preside on the trial of any cause in the event of which he may he interested, or when either of the parties shall be connected with, him by affinity or consanguinity, within such degrees as may be prescribed by law, or in which he may have presided in any inferior court, except by consent of all the parties: Art. v. s. 11. This provision is certainly broad enough to fortify the integrity of the courts against suspicion; for the mere blemish of suspicion is, to the judicial ermine, a blot of defilement. It was an observation of Lord Coke that even an act of Parliament made against natural equity — as to make a man a judge in his own case — is void in itself: Co. Litt., s. 212. And it is a familiar remark of Sir "William Blackstone that the administration of justice should not only be chaste but unsuspected. The maxim applies in all cases where judicial functions are to be exercised and excludes all who are interested, however remotely, from taking part in their, exercise. It is not left to the discretion of a judge' or to his sense of decency to decide whether he shall act or not; all his powers are subject to this absolute limitation, and when his own. rights are in question he has no authority to determine the cause: Cooley Cons. Lim., 411; Washington Insurance Co. v. Price, Hopk. Ch., 2. In an English case when *111 the Lord Chancellor, who was a shareholder in a company in whose favor ' the Vice-Chancellor had rendered a decree, affirmed the decree, the House of Lords reversed the decree on this ground, Lord Campbell observing: “It is of the last importance that the maxim that no man is to be a judge in own case, shall be held sacred, and it is not to be confined to a cause in which he is a party, but applies to one in which he has an interest. This will be a lesson to all inferior tribunals to take care, not only that in their decrees they are not influenced by their personal interest, but to avoid the appearance of laboring under such an influence:” Dimes v. Proprietors Grand Junction Canal, 3 House of Lords Cases, 759.
Such is an example of the prestige preserved by the judiciary of England upon this subject, where the rule is a mere maxim of national equity; and it should be even the more sacredly guarded in this country, where it is a principle of the organic law itself. We entirely concur, therefore, with the counsel for the plaintiff, that no judge should preside in a cause, or render any judgment, or make any order, where he can by possibility be suspected of being warped by the influence of fear, favor, partiality, or affection. When once a court has lost the charm, of integrity and justice, with which it should ever be invested, it forfeits its influence for good, and degrades the majesty of the law. /
The idea that the judicial office is supposed to be invested with ermine, though fabulous and mythical, is *112 yet most eloquent in significance. We are told that the little creature called the ermine is so acutely sensitive as to its own cleanliness, that it becomes paralyzed and powerless at the slightest touch of defilement upon its snow-white fur. When the hunters are pursuing it they spread with mire the passes leading to its haunts, to which they then drive it, knowing that it will submit to be captured rather than defile itself. And a like sensibility should belong to him who comes to exercise the august functions of a judge. It is his exalted province to pronounce upon the rights of life, liberty, and property, to make the law respected and amiable in the sight of the people, to dignify that department of the government upon which, more than all others depend the peace, the happiness, and the security of the people. But when once this-great office becomes corrupted, when its judgments come to reflect the passions or the interest of the magistrate rather than the mandates of the law, the courts have ceased to be the conservators of the common weal, and the law itself is debauched into a prostrate and nerveless mockery.
These observations must be taken in their general sense, and not as having any special application to the facts of this case. According to the record presented by the plaintiff, we do not think there is any ground to impeach the competency or impugn the motives of ■ the judge who sat in this cause. His mere presence at a public meeting of his neighbors did not commit him in any degree to the action of the meeting, or identify him with its purposes. We *113 have his positive and uncontradicted declaration from the bench that he did not in any manner participate in the proceedings of the meeting. The mere curiosity which led him there certainly can not be held to make him a party to any combination, lawful or unlawful, then and there concerted.
We come now to consider the last and most important question involved in this case, and that is, whether the law of the case was correctly expounded to the jury. The defendants insist that at the time of the alleged trespass upon the plaintiff’s property there existed an absolute public necessity for its destruction. The right of defense and self-preservation is a right inherent in communities as well as individuals. Whether an imminent and absolute necessity exists to destroy private property for the common good, is a question to be determined by a jury upon the facts of each particular case. An individual may take life to preserve his own, if he be in danger of death or great bodily harm, or think himself so upon reasonable grounds. But the grounds of his apprehension must be founded upon such facts as will acquit him of acting upon a mere fancied peril or with feckless incaution. The law is jealous in the protection it throws ' around human life and property, and the right to take either as a measure of self-preservation is to be exercised in a moment of extraordinary exigency when the private or public necessity absolutely demands it.- The right to destroy property in cases of extreme emergency, as to prevent the spread of a conflagration, ' or as in the case now *114 tinder consideration, is not the exercise of the' right of eminent domain, nor the taking of property for public use, but a right existing at common law, founded on necessity, and it may be exercised by individuals in any proper case, free from all liability for the value of • the property destroyed: American Print Works v. Lawrence, 1 Zab., 248; Sorocco v. Gaines, 3 Col., 69.
There may be, it,is said, a strong controlling public necessity demanding the destruction of private property. The instances usually given are, to prevent the spread of a fire, the ravages of a pestilence, the advance of a hostile army, or any other great public calamity: Cooley Const. Lim., 594; 18 Wend., 129; 2 Denis, 461; 3 Col., 69; 1 Zab., 714; Id. 248; 15 Wend., 397. It is not an appropriation under the right of eminent domain, but an exercise of the police power: 3 Col., 69. The destruction is authorized by the law of overruling necessity; it is the exercise of a natural right belonging to every individual, not conferred by law, but tacitly excepted from all human codes. 2 Denio, 473; 1 Zab., 714; 4 Zab., 590. There are many cases, says Chancellor Kent, in which the rights of property must be made subservient to the public welfare. The maxim is that a private mischief is to be endured rather than a public inconvenience. On this ground rest the rights of public necessity. So it is lawful, says he, to prevent the spreading of a conflagration. These are the cases of urgent necessity in which no action lay at common law by the individual who sustained the injury; but *115 private property must in many ' other instances yield to the general interest: 2 Kent, 406, 407. But, says Mr. Greenleaf, if the defendant justifies the destruction of the plaintiff’s property by the defense of his own, he must aver and prove that he could not otherwise preserve his own property: 2 Greenl. Ev., s. 630; 1 Saund., 84; 11 East, 568; 1 Carapb., 41; and certain examples are given of the existence of the necessity, as in the rapid spread of a conflagration, where houses must be destroyed in order to stop the fire. And other familiar examples are cited in the English books, as when the plaintiff’s dog was killed in the act of ' pursuing the defendant’s deer in his park, or rabbits in his warren, or poultry within his own grounds, this will justify the killing without the proof of any higher necessity: 2 Greenl. Ev., s. 630; 3 Lev., 28; Cro. Jac., 45; 1 Campb., 41; 11 East, 568. Ve have cited these general principles in the language of the books, to illustrate as nearly as possible the nature and character of that necessity which will justify the destruction of private property in like cases. It is difficult to define it except in general terms, and each case must depend upon its own facts. An unsubstantial panic is not such a necessity, but such a state of facts must be shown as to leave no doubt of an impending and imminent peril, or that a reasonable' ground existed for the apprehension of such a peril, to justify the act; or in the language of Mr. Green-leaf already cited, if the defendant justifies the destruction of the plaintiff’s property by the defense of his own he must show he could not otherwise pre *116 serve his own property: 2 Greenl. Ev., 630. The advance of the hostile army is cited as among the exigencies when such a necessity might exist to justify the destruction of private property. But what kind of private property may be thus destroyed would depend much upon the character of the warfare waged at the time, and upon the circumstances existing in the community. Thus the destruction of a bridge or .a boat, to check the advance of an army, or the explosion of a magazine of powder, or the destruction of munitions of war or military supplies, or any articles contraband of war, would be but the exercise of a recognized belligerent right, and the rapid advance of a hostile army known to be undisciplined and licentious, and whose occupation of captured places in the line of march was known to be accompanied by acts of besotted vandalism, imperiling the lives and property of the people, would upon the ground of public necessity justify the destruction of such property as is calculated to increase the public peril. But all these facts must enter into the consideration of the question whether the public peril did exist, or whether there were reasonable and substantial grounds to believe so. Necessity, says Lord Coke, makes that lawful which would be otherwise unlawful: 8 Coke, 69. It is the law of a particular time and place: Hale P. C., 54. It overcomes the law: Hob., 144; and it defends what it compels: Hale P. C., 54. In these brief maxims is written the whole reason of the law that justifies the destruction of private property for the public good. We are unable to discover *117 wherein his honor the Circuit Judge has made any material departure from the principles herein announced, either in his general ory supplemental charge. But, for the errors in his rulings upon questions of evidence, the judgment will be reversed and a new trial awarded.