STATE of Tennessee, Appellee,

v.

Tommy Joe WALKER, Appellant.

Supreme Court of Tennessee,
Knoxville.

Sept. 18, 1995.

Charles W. Burson, Attorney General and Reporter, Rebecca L. Gundt, Assistant Attorney General, Nashville, for Appellee.

Mark E. Stephens, L. Jeffery Hagood, Keith Lieberman, Knoxville, for Appellant.

## OPINION

CHARLES H. O'BRIEN, Special Justice.

On 2 August 1989 a presentment was returned by the Knox County Grand Jury charging defendant, Tommy Joe Walker, his brother, Ernest J. Walker, and his nephew, Danny Branam, with the homicide of Ms. Gladys Houston. Defendants were also charged with armed robbery, conspiracy to commit armed robbery and conspiracy to commit robbery. Subsequently, severances were granted at the State's request. Branam was tried separately and convicted of first degree murder, armed robbery and conspiracy to commit armed robbery. On appellate review this Court found the death penalty was disproportionate to Branam's participation in the offense and remanded for resentencing.[1] The Court held that remand was also required to determine whether Branam's due process rights were violated by the prosecutions alleged withholding of evidence. Branam's case is now pending in the trial court. Ernest J. Walker's first trial ended in a mistrial because of the jury's failure to reach verdicts. At his second trial both defendant and the State were granted interlocutory appeals. The Court of Criminal Appeals held that it was error to exclude admission of a transcript of the testimony of Branam given at a new trial motion hearing in this defendant's case. The case was remanded and Ernest Walker subsequently submitted a guilty plea.

At a jury trial this defendant was found guilty of felony murder and sentenced to death. He received a 30 year sentence for armed robbery and was sentenced to 12

1. *State v. Branam,* 855 S.W.2d 563 (Tenn.1993).

years for conspiracy to commit a felony with both sentences to be served consecutively to the death sentence imposed. He has appealed the judgment of the trial court on both the guilt phase and the sentencing phase of his trial.

The issues are stated in a fragmented fashion by defendant who first charges error to the trial court in admitting into evidence statements of co-defendants Danny Branam and Ernest J. Walker as statements of co-conspirators.

It is defendant's insistence that the statements of Danny Branam, three or four days after the homicide of Gladys Houston, to the effect that defendant shot the victim, as well as similar statements made by Ernest Jay Walker to Naomi Elliott after her husband's arrest in February 1989 and after his release from jail; as well as the taped recording of a conversation between Danny Branam and Naomi Elliott made on 5 March 1989 were not made during the course of and in furtherance of a conspiracy as excepted by Tennessee Evidence Rule 803(1.2)(E). Defendant's entire argument on this issue relies on federal authorities for analysis on the admission of these statements.

There are several misconceptions which must be clarified in order to place this case in its proper prospective. In defendant's brief an analogy is drawn between Federal Rule of Evidence 801(d)(2)(E) and Tennessee Rule of Evidence 803(1.2)(E). In *Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970), the Court clearly analyzes the difference:

That the two evidentiary rules are not identical must be readily conceded. It is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course and in furtherance of the conspiracy and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise. (Citations omitted). The hearsay exception that Georgia applied in the present case, on the other hand, permits the introduction of evidence of such an out-of-court statement even though made during a concealment phase of the conspiracy.

But it does not follow that because the federal courts have declined to extend the hearsay exception to include out-of-court statements made during the concealment phase of a conspiracy, such an extension automatically violates the Confrontation Clause.... merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied. (Citing *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

The evidence heard by the jury, including defendant's own admissions to various of the witnesses who testified, was sufficient to establish that he entered into a conspiracy, in combination with his brother and his nephew, to rob Gladys Houston, within the definition of the term conspiracy contained in T.C.A. § 39–1–601, et seq., repealed by Chapter 591 of the Public Acts of 1989. This statute provided in pertinent part that "the crime of conspiracy may be committed by any two (2) or more persons conspiring: (1) To commit any indictable offense.

The seminal question then is whether evidence of the recording between Danny Branam and defendant's sister, Naomi Elliott; statements made by the defendant to his sister and brother-in-law three or four days after the homicide; and the statements made by E.J. Walker to his sister, were made in consonance with the law in effect at that time.

Prior to the enactment of the conspiracy statutes, first noted in the Code of 1858, the law was plainly stated that a conspiracy is, in general terms, a combination of two (2) or more persons, by concerted action, to accomplish some criminal or unlawful purpose. Everyone entering into a conspiracy is a party to every act which has been done before by the others and to every act by others afterward, in furtherance of the common design. All acts or declarations of conspirators, or of any of them, may be given in evidence against all, from the time the conspiracy had

its origin until its design has been consummated, or until it is abandoned. But the declarations or acts of one can not be admitted against another, unless the facts and circumstances warrant the conclusion that a conspiracy was existing at the time of such declarations or acts. *Owens v. State,* 84 Tenn. 1 (1885). (Tenn.1958).

The earliest and most complete reference to the law as it existed in that time is found in *Sweat v. Rogers,* 53 Tenn. 117, 120 (1871). The conspiracy charged in that case was that two (2) persons, at the instigation of the defendant, set fire to a storehouse, and stole and carried away the goods not consumed by the fire. The Court, citing *Greenleaf,* Vol. I, Sec. 111, as follows: "Care must be taken that the Acts and Declarations thus admitted be those only which were made and done during the pendency of the criminal enterprise and in furtherance of its objects. If they took place at a subsequent period, and are therefore merely narrative of past occurrences, they are, as we have just seen, to be rejected." This authority was cited with approval in *Harrison v. Wisdom,* 54 Tenn. 99, 108 (Tenn.1872). In *Snowden v. State,* 66 Tenn. 482 (1874), the defendant was put to trial in a presentment charging him and two (2) others in the larceny of three (3) head of cattle. A judgment of conviction was entered against him. At trial one of the three (3) confessed implicating all of them. The Court found that the larceny was already complete, and that the confessor was detailing a past transaction, even though the cattle may have not yet been sold. The Court ruled that "when the common purpose is at an end, whether by accomplishment or abandonment, no one of the conspirators is permitted by the subsequent act or declaration of his own to affect the others."

In *State v. Crabtree,* 655 S.W.2d 173 (Tenn. Cr.App.1983), the Court of Criminal Appeals noted that "a conspiracy may continue after the crime has been completed for, among other things, the concealment of the crime or to prevent witnesses from testifying." We conclude that this statement in *Crabtree* has been totally abrogated by the current statute, T.C.A. § 39–12–103, defining criminal conspiracy. The law on the subject of conspiracy at the time of the offenses in this case remains as set out in the cases we have cited herein.

■ Due to the manner in which this issue has been presented the Court finds it expedient to address the purported statements of co-conspirators in the sequence in which they were presented in court rather than the chronological order in which they occurred. Each of the statements objected to came in through the testimony of Naomi Elliott. The robbery and homicide which are the basis of the charges against this defendant occurred in July 1987. In March 1989 Ray Elliott, had been arrested as an accessory before the fact to the homicide of Mrs. Houston. After talking with counsel Mrs. Elliott agreed to go to the penitentiary and talk to Danny Branam, wearing a device to tape record their conversation. This was accomplished and the tape recording of this conversation was introduced into evidence at defendant's trial under the co-conspirator exception to the hearsay rule. The trial court specifically held the conversation admissible because statements in it were made "in an effort to conceal detection of the crime." The argument of counsel, for and against the admission of the tape recording was intense. The recording itself was garbled almost beyond transcription. The several transcripts made of the tape all differed in some respects. Its admission is the basis of a number of the issues raised for reversal on this appeal. In Tennessee Law of Evidence, (2nd Ed.1990), the authors have made an analysis of the admissibility of conspirator's declarations under Evidentiary Rule 803(1.2)(E). Although, as we have noted, the rules were not in effect at the time of the commission of the offense in this case the analysis made follows the prior law. For a statement of the co-conspirator to be admissible it must have been made "during the course of" the conspiracy which means that the conspiracy must have been ongoing at the time the statement was made. If the conspiracy had not yet begun or had ended when the statement was made, the declaration is not admissible under this hearsay exception, although it may still be admissible under some other exception, such as a declaration against penal interest. The exception requires the declaration to be "in furtherance

of" as well as being made during the existence of the conspiracy. If a conspirator is apprehended and tells all to the police, it is unlikely the confession is admissible as a conspirator statement. A statement to the police can hardly be in furtherance of the conspiracy. It becomes only a narrative statement of past conduct between the conspirators. The recording in question was not admissible in evidence against the defendant in this case.

■ The next complaint of the defendant is to a further statement by Danny Branam occurring three or four days after the killing. It is essential to note that defendant was charged with conspiracy to commit armed robbery and conspiracy to commit robbery. That conspiracy ended with the consummation of the robbery. The homicide of Mrs. Houston was incidental to the robbery. If a further conspiracy existed at that time it would of necessity have been to conceal the circumstances of the homicide and concealment of the murder weapon. Branam's statement to Mrs. Elliott went far beyond that, relating the circumstances of the robbery as well as the facts surrounding the shooting of the victim. It was inadmissible.

In reference to Mrs. Elliott's repetition of her conversation with Ernest J. Walker, the record shows she related the substance of two conversations. The first of these involved only a statement he made that the shell casings discovered at the scene was not sufficient evidence to stand up in court. She testified that later on, after her husband got out of jail, they talked to Ernest Williams again when he told them about the circumstances surrounding the robbery and homicide, including the fact that defendant did the shooting. This too was inadmissible.

■ The State asserts defendant did not object at trial to the admission of the statements made by Danny Branam and Ernest Walker to Naomi Elliott and did not raise this issue in his motion for new trial and therefore these issues were waived under the authority of State v. Strouth, 620 S.W.2d 467, 471 (Tenn.1981); State v. Coker, 746 S.W.2d 167, 173 (Tenn.1987); and T.R.A.P. 3(e). We agree.

Moreover, this evidence was no more than corroboration of defendant's own admissions on three separate occasions evidencing his participation in the robbery and homicide and, specifically, his identity as the trigger man as well as other evidence of his complicity, both circumstantial and direct.

This evidence clearly showed that during the early morning hours of 23 July 1987, Gladys Houston was shot to death when she arrived at her home on Potomac Drive in Knox County after working until about midnight at her family's livestock business in Sweetwater, Tennessee. Around 1:15 a.m. neighbors were awakened by the sound of gunshots and a honking horn. One neighbor looked out her window and saw a car driving away from the direction of the Houston house toward the Alcoa Highway. Summoned by a neighbor, sheriff's officers arrived at the scene to find Mrs. Houston inside her automobile, barely alive and slumped over the steering wheel. The driver's door, the glove box and car trunk were open. The evidence is conflicting as to whether the front passenger door was also open when the first officer arrived. The driver's side of the rear window of the vehicle had been shot through three (3) times, one bullet passing completely through the driver's headrest. Expended rounds were found inside the car in the front windshield on the driver's side, between the front seats, and in the passenger door. Spent 9MM cartridge casings were on the ground behind the vehicle. Officers discovered Mrs. Houston's purse outside the car on the passenger side. An unfired .25 caliber automatic weapon belonging to Mrs. Houston was lying on the floorboard on the driver's side. The keys to the automobile were missing. Mrs. Houston died later at a local hospital. She had bled to death from her wounds. She had been shot several times, once in the left hand, once through the right side of the chest, and once in the back of the neck, the bullet exiting through her nose. There was an additional, minor wound to her scalp. Around 8:30 a.m., later in the morning of the shooting, a neighbor taking a walk found a six-pack of beer, a paper bag containing tomatoes and an empty money bag scattered along the side of Potomac Drive leading from

the Houston residence to the Alcoa Highway. Paper wrappers designed to hold stacks of quarters were strewn on the pavement near the money bag. Mrs. Houston's husband identified the money bag as the one used by her to carry change from the vending machine at the stockyard. It had contained approximately $6.50 in quarters when she left work. A customer had also given her a sack of tomatoes the day before she was killed. A brown carrying case containing Mrs. Houston's jewelry, some cash and bank bags holding several hundred dollars in receipts from the restaurant and flea market at the stockyard were found in the car trunk when police conducted an inventory of the vehicle.

Other evidence established that about 6:45 p.m. on Wednesday, 22 July, three (3) unidentified men entered a bar called "Sam's Place" located near the Houston Stockyard in Sweetwater. The men left about 7:00 p.m. in a Cadillac and drove away in the direction of the stockyard. Around midnight that same evening a customer delivering cattle to the stockyard saw the same car sitting "in an unusual place" on the road at the stockyard. One person was in the car; another was standing outside on the passenger side. Neither of these men were identified. The same night between eleven and twelve o'clock two (2) stockyard employees were standing next to the Cadillac, which was parked at the stockyard. A man resembling Danny Branam, who both women knew, got out of the back of the car and, turning his face away from the two women, went inside the stockyard building. When he opened the car door the interior light came on and the two women saw two other people sitting on the front seat. The driver, a man resembling the defendant, had dark, curly hair and wore glasses. The person in the passenger seat had straight brown hair. After five or ten minutes the person resembling Branam returned to the car. Again he turned his face away from the witnesses. The car and its occupants drove away 20 to 30 minutes before Gladys Houston left the stockyard. The car seen by the several witnesses belonged to Ray "Speck" Elliott, the defendant's brother-in-law. Police later found spent 9MM shells at Elliott's farm in Union County. These shells had been fired from the same gun as the bullets and shell casings found at the site of the Houston killing.

Elliott and his wife, Naomi, defendant's sister, testified that Ernest Walker, had asked to borrow Elliott's cadillac. At the time he was accompanied by defendant and Danny Branam. The men said they wanted to borrow the car to "go try to make some money" in Sweetwater. They indicated that they were going to talk about "some business" with a man named Otis Bivens.

When the three men returned the car (a couple of days later according to Ray Elliott, early the following morning according to his wife), they had Elliott's 9MM gun. The defendant informed Elliott that he had "borrowed" the gun and that Elliott would have to get rid of it because defendant had used it to kill a woman. Defendant claimed he had been forced to kill the woman because she had a gun. Before leaving, he warned the Elliotts, "if this goes outside this room about what I have said about what happened, you will get the same thing the bitch got."

Three other persons testified defendant had confessed his participation in the homicide. The first of these was Terry Boling, a convicted felon and an acquaintance of both the defendant and Ray Elliott. Boling testified that in the early morning hours of 23 July 1987 defendant came to his house and asked for cocaine and $20. Defendant was high at the time and was driving Elliott's cadillac. When Boling stated that he had no cocaine and no money, defendant told Boling that he had just seen "this whore get her head blew off" and that "they had just got . . . $6.50 in change and a bag of tomatoes." Defendant, who appeared unfazed by what had happened, explained he had gone "there" to make some money.

Jackie Lynn Dawson, Danny Branam's brother, testified that about 18 months after the Houston murder defendant had gotten drunk and told Dawson that he was involved in a murder in South Knoxville. Defendant said he had gone to a house in the Martha Washington subdivision to rob a woman and that the robbery had been set up by Otis or Greg Bivens, who had told him that the

woman would be carrying "a lot of money." According to Dawson's testimony defendant recounted how he had hidden behind a tree on the left side of the driveway, rushed out and yanked open the car door as the victim started to open it. When the victim pulled a gun from her pocketbook, he shot her. While he was checking around the car, the victim began to thrash about and defendant shot her several more times.

Peter Talarico, an inmate at the State Penitentiary in Pikeville testified that while he was helping defendant with legal research defendant told him that he, his brother and his nephew "went to rob this lady" and "he had to shoot her because she got on the horn." Defendant said he got $6.00 in the robbery and that he taken the keys from the car and opened the trunk to see if there was any money there.

■ Unquestionably, the admission of the Branam tape as well as the additional statements made by Branam and by defendant's brother Ernest Walker may be considered harmless error in light of the foregoing evidence. T.R.A.P. 36(b), *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *State v. Porterfield*, 746 S.W.2d 441, cert. denied 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

A number of issues have been raised charging misconduct on the part of the prosecutor during the course of the trial. In the main, had there been any conduct on the part of the State's counsel which could have been considered to warrant reversal, the failure to object contemporaneously, or to raise such conduct as reversible error in the motion for new trial is deemed to be waived under T.R.A.P. 3(e). Due to the gravity of the case, we have also considered this assignment and find it to be without merit.

■ The first complaint under this issue questions the State's motive in requesting a severance of the three (3) defendants who were indicted jointly. Initially the State moved for a severance to avoid confrontation problems due to various statements by the defendants incriminating one or more of the others. Subsequently the State concluded that the statements were admissible as state-

ments of co-conspirators. There is nothing in this record to indicate misconduct of the prosecutor in changing his theory of presenting the evidence. There is no indication that the district attorney did anything improper which was calculated to produce a wrongful conviction.

■ The same is true regarding the inference made that the State showed bad faith in refusing to make available to trial counsel the tape of a recording between Naomi Elliott, defendant's sister, and Danny Branam, his co-defendant and nephew. The record clearly shows that for some six (6) months before trial defense counsel was aware of the existence of the tape and the extreme difficulty incurred in attempting to make an accurate transcript.

■ Complaint is also made that the prosecutor denied the defendant pretrial access to certain exculpatory material in accordance with the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The first such item of evidence purported to be exculpatory is a statement from an individual named Calvin Hurst taken by a law enforcement officer approximately one (1) week before defendant's trial began. Hurst stated that a week prior to making his statement he had been told by Jay Walker, who was drunk, that "they" had shot and killed a woman named Houston. According to Hurst's statement Jay said he, Tommy Walker, Danny Branam and Ray Elliott were involved in the killing. As a supplement to the statement a reference was made by the law officer to a conversation Hurst had with Ray Elliott while they were working together in Gatlinburg. Elliott had been involved in a confrontation with a fellow worker and told Hurst "I'll kill him just like we did the Houston woman." Hurst said "I ask (sic) him who we was and he said Jay Walker, T.J. Walker and Danny and him."

The second reference was to two (2) inconsistent pretrial statements of a State witness, Terry Bowling, contained in investigative reports made by law enforcement officers. The first of these, dated 3/9/89, was the report of an interrogation of Bowling by Detective Larry Johnson. The officer noted

that Bowling stated he had a conversation with Tommy Joe Walker on the night of 7/22/87 or the morning hours of 7/23/87 in which Walker said that Danny had just "blew" a woman away. This same report included information from an interview with defendant, who was then in the Knox County jail, on unrelated charges, taken about an hour after Bowling was interviewed. Defendant related he had been released from the penitentiary in June, 1987 and had stayed with Ray and Naomi Elliott. When asked if he knew about a 9MM [weapon] owned by Ray Elliott he stated he heard that Ray owned such a weapon but thought he had probably sold it or traded it for drugs prior to his (Walker's) release from the pen. When asked about the Gladys Houston homicide he stated the only person he had ever killed was in 1976 and contended that was in self-defense. When informed that this would be his only chance to give his version of what had transpired in the morning hours of 7/23/87 Walker stated he didn't know anything about Gladys Houston and didn't know anything about the homicide.

For some unknown reason Terry Wayne Bowling was interviewed again by police investigators on 8 May 1990, the day before his testimony at the trial. Under interrogation he reiterated in some detail the statement made on 3/9/89, but he was not asked, nor did he say, who actually killed Gladys Houston. The statement also included interrogation about Ray Elliott to which he responded that Elliott had told him T.J., Jay and Danny had stolen his gun, used his car and tried to set him up in it.

The information given by Calvin Hurst to law enforcement officers appears to be contained in an investigative report, not in a signed statement by Hurst. The same is true of the allegedly "extremely inconsistent pre-trial statement" made by Terry Bowling. Neither would be admissible under the discovery and inspection Rules of Criminal Procedure. See Rule 16(a)(2). Further, under our review of the record we do not find the investigatory reports to be exculpatory evidence favorable to the defendant under *Brady*, supra, standards. Rather, they tended to inculpate defendants brother-in-law, Ray El-

liott, in the offenses for which defendant was on trial. In *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the court elaborated on the sense of *Brady* as follows:

> The heart of the holding in *Brady* is the prosecutions suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defendant, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence....
>
> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.

■ There is little comfort for defendant in the judgment of *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which is cited for the rule that evidence which may be used to impeach a state witness is considered exculpatory. In *Bagley*, the court made plain that the *Brady* rule does not require a prosecutor to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive him of a fair trial, holding that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. The court made plain that evidence withheld by the government is "material," requiring reversal of a conviction, only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. We have reviewed this record extensively because of the many contradictions in the evidence and complications resulting from three (3) separate trials of the three (3) defendants growing out of the same circumstances. We find no such reasonable probability in this case.

■ Defendant's brief next suggests misconduct on the part of the State's attorney, saying that a transcript was materially altered mid-trial to include "the damning phrase," 'they were there,' when the phrase had not appeared in three (3) previous transcripts, two of which had been prepared by

the State. It was argued that the altered transcript was supplied mid-trial to defense counsel knowing defense counsel would only have a few minutes to review it.

The State refutes the defense version of the occurrence saying that there was a prior discussion regarding the transcripts with an agreement that certain changes would be made in order to prevent the jury from learning of defendant's prior criminal record. The State asserts that defense counsel had a copy of the transcript during the testimony of the involved witness and did not object to any changes made in the transcript at that time. They say this portion of the transcript was pointed out when it was tendered to defense counsel and imply that the defense statement that counsel first learned of the existence of the particular phraseology during the State's rebuttal closing argument is inaccurate.

The issue arose when the State proposed to introduce a tape recording of the pre-arranged meeting between defendant's sister and his co-defendant nephew, Danny Branam, at the Brushy Mountain Prison where Branam was incarcerated on an unrelated offense. Her husband, Ray (Spec) Elliott had been charged as an accessory before the fact in the Houston robbery and homicide. Ms. Elliott was clearly bent on eliciting information which would clear her husband of the charges. The recording was deplorably poor in audibility. It was also peppered with profanity and vulgarities on the part of both Ms. Elliott and her nephew. The questioned statement was made by Mr. Branam. In the transcript produced by defense counsel it appears that he said, "I don't think—to tell you the truth, I don't think Jay and Joe would say nothing. (Inaudible)—They both know, (inaudible)—burn their goddamn ass. I believe that somebody on down the (inaudible)—" In the final version submitted by the State this statement became, "I don't think—to tell you the truth, I don't think Jay and Joe would say nothing *cause they were there* and they both know, that's gonna—burn their goddamn ass. I believe its somebody on the outside or something."

The trial court heard extensive and intensive argument on this issue, at the conclusion of which he ruled as follows:

Well, the main issue—and I don't intend to slight the remaining matters and the Motion for New Trial, but counsel has chosen to address this one as the most pertinent, I guess is a fair way to say it, on what they think should cause this Court to grant the new trial in this case over some wording in the transcript, a conversation between Naomi Ruth Elliott and Danny Branam. And it is unusual in the instance that the tape itself and the transcript that was ultimately passed to the jury were introduced into this record without objection. And we are at the point now where we're saying that that was error for it to be admitted.

Of course, there would be case after case after case in this jurisdiction and others that speak against that.

In this matter we spent considerable time—I don't recall exactly how long it was, but I know that the Court and counsel were in here arguing over this transcript for a lengthy period of time, some discussions in chambers. Most of our discussion took place right on this record where a large majority of it took place because we had to come into this courtroom to have the technical assistance to listen to this tape. We went over and over and over certain sections of it.

At the time the transcript was admitted into evidence 14 copies were marked for identification so each of the jurors could have access as an aid to listen to this tape. The Court instructed the jury that the tape is the evidence; the transcript is not; its merely an aid. That comports with Tennessee law in the manner in which that was had. I don't know exactly how many times the jury was reminded of that, several times.

I'm not at all convinced that the phraseology that is apparently the most objectionable on page 31 of this transcript that had that been taken out at the time that this jury was allowed to follow this transcript the time we listened to this tape—I don't necessarily agree with you, Mr. Stephens,

that it is that critical in the overall trial of this case.

There was significant evidence in this document over and above that that would have allowed rational triers of fact to find guilt beyond a reasonable doubt in the trial of Tommy Joe Walker, significant, the least of which not being the words from his own mouth.

I'm going to allow—I'm going to allow the filing of these other transcripts. I think that is—that is important for a reviewing court. They had come in under a proffer in any regard. They will be allowed, Mr. Stephens, for other individuals to review.

The trial judge overruled the motion for new trial. It would have been reprehensible for State's counsel to deliberately endeavor to insert any matter into the record surreptitiously. It would be equally unprofessional for defense counsel to allow such material to go into the record without objection and then raise the issue on a motion for new trial. Our review of this record satisfies us that neither counsel for the State nor the defendant are guilty of such unconscionable conduct. We are in accord with the conclusion of the trial judge that there was significant evidence, not only in the tape recording of the conversation between Naomi Elliott and Danny Branam, but in the testimony of other witnesses, that would have allowed any rational trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Defendant also raises an issue concerning the propriety of the conduct of the Attorney General during the examination of State witness, Ray Elliott. Complaint is made of several questions asked of Elliott by the State's attorney in direct examination because the answers indicated that the defendant was a thief and used drugs. Defendant also complains of questions eliciting responses concerning statements of co-defendants Branam and Ernest Walker. No objection was raised to any of these questions nor was the issue raised on motion for new trial. This constitutes waiver of the issue. T.R.A.P. 3(e). A further objection is raised to remarks made by the attorney general

during defendant's cross-examination of Elliott. It is contended that these comments improperly vouched for the credibility of the witness and disparaged the defense counsel. Our review of the record does not support this contention. The comments were made in conjunction with the State's objections to portions of the cross-examination. There was no contemporaneous objection made to any of those statements and the issue was not raised on the motion for new trial. This issue involves one of a number of heated exchanges between counsel during the trial of this case. Both counsel for the State and the defense exceeded the bounds of appropriate trial conduct in their zeal to represent their respective interests. The State's attorney's remarks during the particular exchange in question were not so egregious as to prejudice defendant and cannot be considered as plain error.

█ Defendant complains of a response by a State witness on cross-examination during the guilt phase of the proceedings. On direct examination of defendant's brother-in-law, Ray Elliott, the witness testified that defendant had told him he had killed a woman with a gun he had "borrowed" from the witnesses' gun case. Danny Branam had confirmed that it happened. In cross-examining about this incident defense counsel asked Mr. Elliott why he did not bother to go call the police. The witness responded "the man made a statement, when the gun was handed back, if—after he had handed me the gun and told what had happened, if anyone inside that room made any attempts to make contact with the police or went outside that room, that they would get the same thing the bitch got is his exact words. And, no, I wasn't telling nobody, because the man had killed before, and I seriously believed him, if it did happen, that my life would be in danger, if I said anything, and I sure didn't say nothing." No action was taken as a result of Elliott's response. There was no motion to strike the response. The issue was not raised on motion for new trial. Later on the State's redirect the State seemed to be directing the testimony toward a repetition of the statement. The trial court sustained objection by the defendant. Defendant com-

plains that no curative instruction was given at this time, but no such instruction was requested. This undoubtedly constituted a waiver. Moreover, the evidence of guilt was more than sufficient for any rational trier of fact to find the defendant guilty of the offense. The spontaneous response by Elliott to defense counsel's question was not attributable to the State and was not reversible error.

A complaint is made in reference to the direct examination of Naomi Elliott, charging that State's counsel solicited improper evidence by the witness and abused his office by vouching for her credibility. It is argued that the nature of the examination informed the jury of defendant's propensity to steal and take drugs and that a statement made by counsel during cross-examination of Ms. Elliott vouched for the credibility of the witness. Here too, defense counsel made no objection to the prosecution's conduct on either of these occasions and did not raise the issue on motion for new trial. The remark made during cross-examination, that the State's attorney felt the witness had done nothing wrong in refusing, on her attorney's advice, to allow the defense team to talk with her, did not vouch for her credibility. The trial judge found need to admonish counsel for both the State and the defendant about making speeches during the course of examination of witnesses.

A similar incident occurred when Jackie Dawson, another nephew of the defendant, was called to testify by the State. The witness questioned his right to have the services of a lawyer. An exchange took place between counsel on this matter during which the attorney general said, "I do not know of anything incriminating that this man knows about this." This case was intensively tried and there were numerous exchanges between counsel which were unnecessary. We do not find any prejudice to defendant's right to a fair trial in this instance.

■ Defendant questions the trial court's action in allowing the State's attorney to ask leading questions of State witness Jackie Dawson. This issue is totally without merit. The attorney general informed the judge that the witness had refused to talk to him before being called to the stand. The witness asked for assistance of counsel. The trial judge assured him that he would not allow him to incriminate himself and would appoint a lawyer for him before he was required to answer any incriminating questions. Moreover, the trial court was aware that the witness had some possible limitations. Under the circumstances it was appropriate to allow leading questions of the witness. *See* Cohen, Paine and Sheppard, Tennessee Law of Evidence, Sec. 611.6 (2nd Ed.1990).

Defendant also argues that the examination of Dawson improperly used his prior statements to police in violation of Tennessee Rule of Evidence 613, which governs the use of prior statements of a witness. Defendant's claim is that the State should have asked Dawson whether the defendant had made incriminating statements to him about Gladys Houston's death and solicited the detail of the statements through Dawson rather than by referring to the substance of the defendant's remarks as related in a prior statement by Dawson to law enforcement investigators. It is his theory that the State was improperly bolstering the witnesses' testimony. The State did frame much of its examination in the context of Dawson's prior interview. However our review of the record of the direct examination of the witness shows that at the critical points in the examination the prosecutor did ask what the defendant told Dawson and not what Dawson had said to the members of the sheriff's department. There is no merit to this argument, and any impropriety in using the earlier statement or any violation of the hearsay rule which may have occurred was purely harmless error.

Defendant suggests bias on the part of the trial judge in his dealing with State witnesses Dawson and Peter Talarico. In Dawson's case it is the contention that the judge showed prejudice against him when he allowed the State to examine Dawson without the presence of an attorney to protect Dawson's Fifth Amendment right against self-incrimination. We have previously discussed this issue. The trial judge did not initially feel that counsel was necessary during the witnesses examination. Nonetheless he sent

for an attorney and allowed the State to proceed subject to limitation if any incriminating questions were asked. None were. Counsel arrived in time to be present for cross-examination. He remained in court throughout cross, re-direct and recross examination. His advice was never required. It is defendant's argument that this procedure gave the appearance to the jury that the trial court was protecting Dawson from the "devious trickery" of defense counsel, thereby casting doubt upon the integrity of counsel and vouching for the integrity of the State's attorney. As we have noted heretofore, there is absolutely no merit to this argument.

█ With respect to Talarico the defendant argues that the trial judge revealed his view of the case to the jury when he informed them the defendant was in the State Penitentiary being held on the present charge without bond on order of the court when the conversation with Talarico occurred. Defendant says this revelation relating the trial court's pretrial disposition of defendant could be reasonably understood by the jury to mean that the court considered the defendant guilty. The trial court addressed the jury in this manner because of defendant's objection that Talarico's testimony would necessarily prejudice him by revealing that he was in prison when he made the statements attributed to him and thus raise the question in the jury's mind that he had committed other offenses. The trial court's remarks were obviously intended to dispel any speculation on any juror's part about why defendant was in the penitentiary. Nothing in the court's remarks could be construed as implying that the court thought the defendant was guilty.

█ Defendant questions the conduct of the State's counsel during argument at the guilt phase of the trial. He complains of various portions of the closing argument charging that the State's counsel misstated the evidence by arguing that the Branam tapes showed that defendant killed Mrs. Houston. The argument actually was that the Branam tape, within the context of all the other evidence, indicated defendant killed the victim. He also complains that certain references to the victim's suffering and wounds were inflammatory and that remarks referring to Ray Elliott's testimony indicating that defendant stole things and referring to defendant's victims, improperly implied to the jury that the State's attorney had personal knowledge of other offenses which raised defendant's character as an issue. Finally, he complains that the district attorney described the case as "a rare case" because there were so many people to say that the defendant had told them what had happened. The implication that this case was a stronger case than others which the district attorney had tried, was not proper argument but, in light of the failure to object and the strong evidence in the case, certainly did not warrant reversal. See *State v. Cone*, 665 S.W.2d 87, 94 (Tenn.1984).

Defendant contends that the State's attorney made an impermissible comment on his failure to testify when State's counsel said during rebuttal argument:

You hear him on the tape, the man who was there saying, 'I don't think Jay and Joe would say nothing, because they were there, and they both know they are going to burn their goddamn ass. I believe it is somebody on the outside.' 'Not you, Naomi. You are not talking.' Naomi talked, Spec talked, Terry talked, Jackie talked, Peter Talarico talked, Danny Branam talked.' 'They were there.'

It is insisted that the meaning of this argument was that defendant did not testify because he was at the crime scene. This is a misinterpretation of the argument, the gist of which is that the testimony of many witnesses shows that "they were there." This issue is totally without merit.

There were further charges of prosecutorial misconduct during rebuttal argument. Defendant complains of argument describing the people with whom the defendant associated as thieves, robbers, drug dealers, and inmates. The State, however, was explaining the quality of its witnesses by saying that these were the types of people to whom the defendant had confessed. The State was describing its own witnesses, not defendant and responding to earlier defense argument

attacking the credibility of the State's witnesses because of their unsavory character. There was no objection raised when the State's attorney was making this argument. The issue is without merit.

■ We find no merit to defendant's complaint charging the trial court with error in granting a severance of the trials of the defendant and co-defendants. Defendant continues to argue bad faith on the part of the State in seeking a severance, contending that the trial court acted arbitrarily without hearing or requiring proof on the issue of whether *Bruton v. U.S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), problems necessitated a severance. This issue was not raised on defendant's motion for new trial. We have spoken on this issue earlier and reiterate that a motion to sever is addressed to the sound discretion of the trial judge and his exercise of such discretion will not be reversed unless it appears that the defendant was prejudiced. *State v. Barber*, 753 S.W.2d 659, 671 (Tenn.1988). Tenn.R.Crim.P. 14(c)(2) states that a trial court shall grant a severance if, among other reasons, it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants. In this case the State informed the trial court that, in addition to Branam's statements on the much discussed tape recording, there were other oral statements by each defendant to witnesses which incurred *Bruton* problems. At that hearing defendant insisted on going to trial because he did not want the case delayed and argued that according to Branam's attorney, the Branam tape did not "hurt" defendant. The record indicates that the several co-defendants had made statements involving one another. In defendant's statement to witness Talarico he specifically said that his nephew and brother accompanied him the night of the robbery. This is one example of such a statement. Defendant has shown no way in which he was prejudiced by granting of the severance. His argument that, if they had been tried jointly, Branam might have testified and exonerated him, or that the allegedly exculpatory testimony of Calvin Hurst might have been revealed, is pure speculation.

Defendant imputes error to the trial judge in denying a request to submit a transcript of the Branam–Elliott tape recording to the jury. We have read the record carefully and find that this did not occur. Therefore it is non-issue. The inaudibility and difficulty in understanding the tape recording in question has previously been noted. Several transcriptions of the tape had been made, each one interpreting parts of the tape differently. When the State's final transcript of the tape was presented to assist the jury in listening to the tape as it was played at trial, defense counsel responded that they had no problem with that so long as the defense was allowed to submit to the jury its version of the tape which had been transcribed earlier by a court reporter. The trial judge reserved a ruling on this issue until after the tape had been played and it could be ascertained how difficult it was to understand. During Naomi Elliott's testimony the State introduced its transcript with no objection from the defendant. Defendant never renewed a request to be allowed on cross-examination to submit the defense transcript to the jury while the tape was replayed, something the court had earlier suggested it might allow in order to assure fairness. This issue was not raised on the motion for new trial and must be considered waived. Moreover, we do not consider the procedure followed to be prejudicial to defendant since the trial judge instructed the jury that it was the tape and not the transcript which was in evidence.

■ Defendant asks if the trial court erred in failing to compare the State's transcript to the tape before allowing it to be presented to the jury, relying on *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir.1983), stating the federal rule for the use of transcripts of tape recordings where the parties are unable to stipulate to the accuracy of the transcript. Tennessee law does not follow the federal rule and does not require such "authentication" of a transcript by the trial court when there is a dispute concerning the transcript accuracy before it may be used by the jury. Tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who moni-

tored the conversation and was in a position to identify the declarant with certainty, and provided the testimony of the witness in whole or in part, comports with the other rules of evidence. *State v. Jones,* 598 S.W.2d 209, 223 (Tenn.1980); *State v. Coker,* 746 S.W.2d 167, 172 (Tenn.1987). This requirement was met in the present case when Naomi Elliott testified that the transcript reflected the conversation between her and Danny Branam. The trial court's directions were exhaustive when he instructed the jury that the tape, not the transcript, was the evidence and they should only go by what they heard on the tape. The jury was instructed:

> Now, this purports to be a transcript of the tape recording that we are about to play to you. The tape recording is the evidence. These purported transcripts have been given to you to assist you in listening to the tape recording in following the tape recording. It is difficult to distinguish. There is outside noise. You will hear that. You are going to need to be on your toes.

> Now, the transcript is to assist you. But, now, what is said on the tape is the evidence, not what is on this written page.

> If you find that there is something on the transcript that you do not hear on the tape recording, you are to disregard what is on this transcript, because this is not evidence. This transcript was prepared by a member of the District Attorney General's office.

> Disregard anything you see on the transcript that is not on the tape recording. If you find discrepancies, then you are to go by the tape recording. The tape recording, as I say, is the evidence that is to be considered by the jury. The purported transcript is merely for your assistance.

The procedure employed by the trial court accompanied by the instructions which were delivered to the jury were sufficient to inform the jury on their duty in reference to the evidence. The issue is without merit.

Defendant asserts that the trial court erred in denying a new trial based on newly discovered evidence which in substance was the testimony of co-defendant, Danny Branam. We find no error on this issue.

After the guilty verdict had been returned in this case but before the sentencing hearing began, defense counsel informed the trial court that Danny Branam was prepared to testify that the defendant had not been present at the time of the Houston murder and moved for a mistrial in the case. When called to testify, Branam, upon advice of counsel, exercised his Fifth Amendment right against self-incrimination and refused to answer any questions. Sometime later, after defendant's trial and after Branam's own conviction and sentence, Branam testified at the hearing of defendant's second supplemental motion for new trial that defendant was not involved in the murder of Gladys Houston. He testified that he, Ray Elliott, and Terry Bowling had committed the offense. According to Branam, Ray Elliott was the killer. The trial judge completely discounted the truth of Branam's testimony describing his credibility as "non-existent." The trial court held that there was no newly discovered evidence before the court and denied this second supplemental motion for new trial.

 The decision to grant or deny a re-trial on the basis of newly discovered evidence is a matter which rests in the sound discretion of the trial court. *State v. Goswick,* 656 S.W.2d 355, 358 (Tenn.1983). This rule, vesting controlling discretion in the trial judge, is particularly applicable where there is a conflict in the testimony heard by the trial court. See *Taylor v. State,* 180 Tenn. 62, 171 S.W.2d 403, 404 (1943). In this case the trial court characterized Branam's testimony as an unsuccessful attempt to perpetrate a fraud on the court. Under these circumstances, where the denial of the motion is based on the lack of credibility of the "newly discovered evidence" we do not find any abuse of discretion. In *Rosenthal v. State,* 200 Tenn. 178, 292 S.W.2d 1, 5 (1956), this Court said: "The trial court has the right to determine the credibility of newly discovered evidence for which a new trial is asked, and if the court is satisfied that, on a new trial, such testimony would not be worthy of belief by the jury, the motion should be denied." We find no abuse of discretion in this case.

Defendant argues several errors committed during the sentencing phase of the trial which would justify a new sentencing hearing or commutation to a life sentence. In the first of these he charges there was improper evidence introduced during the testimony of the criminal court clerk to the effect that he had been previously charged with murder.

One of the aggravating circumstances relied upon by the State was defendant's prior conviction of a violent felony. As evidence of this circumstance the State called as a witness Ms. Martha Phillips, the Criminal Court Clerk for Knox County. Ms. Phillips testified, from a certified copy of a warrant and judgment, that defendant had been convicted of voluntary manslaughter in 1977. The State inquired about the contents of the warrant and she replied that it showed defendant had been charged with murder. No objection was made to this testimony although an unsuccessful effort was made to prevent the introduction of the warrant and judgment into evidence as an exhibit to her testimony. The judgment instrument was admissible to establish defendant's prior conviction of a violent felony. *See State v. Smith,* 755 S.W.2d 757, 764 (Tenn.1988). Moreover, we note that defendant's sister testified on his behalf and related the circumstances underlying the manslaughter conviction.

Defendant also argues that the trial court erred in not instructing the jury regarding the elements of voluntary manslaughter in accordance with this Court's decision in *State v. Williams,* 690 S.W.2d 517, 532 (Tenn.1985). We observe in the first instance that there was no objection to the challenged instruction at trial nor was the issue raised on motion for new trial. Moreover, defendant was prosecuted under the law in effect at the time of the commission of the offense. T.C.A. § 39–11–112. At that time the manslaughter statute, T.C.A. § 39–2–221, did not contain the phraseology which he avers was missing from the court's instruction. We do not retreat from the rule stated in *Williams,* supra, but find it was inapplicable in this case.

Defendant has raised a number of other issues which he asserts were reversible error in the sentencing phase of the trial. In a good many of these claimed errors there was no contemporaneous objection made and in some the issues were not raised on the motion for new trial. A trial court cannot be held in error when it was not given an opportunity to rule on the issue raised at an appropriate time during the course of the trial.

A complaint is made of improper cross-examination of Mary Branam, sister of the defendant, who was called in the case to testify about defendant's childhood and to establish his good character during his earlier years. State's counsel began a vigorous cross-examination about this era of defendant's life. At this point there was a good deal of testifying on the part of counsel for the State and for the defendant. While some objections were made to the State counsel's examination, for the most part this portion of the examination passed without contemporaneous objection. The court maintained control of the cross-examination when objection was made. These issues were brought to the court's attention after the close of all the evidence. At that time the court said that it had been "fair cross-examination based on the assertions of the declarant." This issue was not raised on the motion for new trial and must be considered waived. Defendant complains of the prosecutor's questions to Ms. Branam about a sawed-off shotgun used in a manslaughter killing as well as the State's reference to the gun during closing argument. There was no objection to this question or argument nor was the issue raised on the motion for new trial.

Defendant asserts that the State's attorney misstated evidence during closing argument when he remarked, "you heard on the tape what people who are raised with Tommy Joe Walker think that this case deserves. 'The shooter deserves to burn,' is the way they referred to it. That is what they feel justice should be. The trigger man deserves to burn." It is defendant's argument that at no point on the Branam tape did anyone say the killer deserved to burn, although there was some comment that he might burn. On objection to this remark the trial court instructed the jury to disregard any statements they did not believe were

supported by the evidence. The jury is presumed to have followed these instructions, which cures any error. *State v. Tyler,* 598 S.W.2d 798, 802 (Tenn.Cr.App.1980).

This was a hard fought case. Counsel for both the State and the defendant verged on the overzealous in their comments and remarks. The trial judge was particularly disturbed about the State attorney's cross-examination of Ms. Branam in reference to an automobile accident in which defendant was involved where a passenger in the other car had been killed, giving the impression of some criminal intent. He emphasized that if the incident was investigated by the grand jury, as the defense insisted, and that the grand jury did not return a true bill then the jury in this case needed to know that. He stated his intent to allow the defense to get all appropriate information before the jury. Insofar as the record is concerned it does not appear that the defense took advantage of this offer. He concluded that otherwise the State engaged in fair cross-examination and we agree with that conclusion although the State counsel's remarks bordered on the improper. *See State v. Bates,* 804 S.W.2d 868, 880–881 (Tenn.1991), cert. denied 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (10–7–91).

■ Defendant says the prosecutor improperly argued that a life sentence might allow the defendant to get out of prison and acted improperly when he stated that if the defendant received a life sentence, "he wins again." There were no objections to either argument, nor was this issue raised on the motion for new trial. The State argues waiver and a failure to show prejudice. We have read all of the argument and although we do not approve the statement made by State counsel we do not find that in the context the argument was made that it has the serious connotation of the similar remark made in *State v. Smith,* 755 S.W.2d 757, 767 (Tenn. 1988), which we found to be highly prejudicial. The trial court was not requested in this case to give a curative instruction and we do not find reversible error.

Defendant asserts that the trial judge erred in not instructing the jury that aggravating circumstances should outweigh mitigating circumstances beyond a reasonable doubt. Defendant refers to the current statutory jury instructions contained in T.C.A. § 39–13–204(g) enacted as T.C.A. § 39–13–203 by Chapter 591 of the Public Acts of 1989, effective 1 November 1989, and redesignated by Chapter 1039, Sec. 3 Public Acts of 1990. The trial court correctly instructed the sentencing law in effect at the time the homicide was committed. *See State v. Brimmer,* 876 S.W.2d 75 (Tenn.1994), cert. denied, —— U.S. ——, 115 S.Ct. 585, 130 L.Ed.2d 499 (11/28/94).

Defendant protests the trial court's failure to deliver a proposed instruction regarding mitigating circumstances submitted to the court. The trial court's instruction on mitigating circumstances was not in error under the law in effect at the time of defendant's trial. *See State v. Brimmer,* supra.

■ A due process violation issue is raised on the question of whether a defendant may be sentenced to death when the jury explicitly finds a lack of premeditation in the course of the commission of a charged homicide. Defendant was charged with premeditated first degree murder and with first degree felony murder. The jury found him not-guilty of premeditated first-degree murder. This Court considered this issue in *State v. Middlebrooks,* 840 S.W.2d 317, 339 (Tenn.1992) saying:

As stated earlier, under the statute prior to the 1989 revision, a person was guilty of first degree murder under the felony murder doctrine without regard to intent to kill so long as the killing occurred during the perpetration of a felony. Yet, this absence of intent does not render the death penalty disproportionate. As Justice O'Connor observed, writing for the majority in *Tison v. Arizona,* 481 U.S. [137] at 157, 107 S.Ct. [1676] at 1688, 95 L.Ed.2d [127] at 144:

[S]ome non-intentional murderers may be among the most dangerous and inhumane of all—the person who tortures another, not caring whether the victim lives or dies, *or the robber who shoots someone in the course of the robbery utterly indifferent to the fact that the desire to rob may have the unintended*

*consequence of killing the victim as well as taking the victim's property.* This reckless indifference to the value of human life may be every bit as shocking in the moral sense as an "intent to kill."

Out of concern for the possibility that a defendant convicted of a felony murder will be sentenced to death is disproportionately higher than the possibility that a defendant convicted of a premeditated killing will be sentenced to death due to the "automatic" aggravating circumstance dealing with the underlying felony, the Court held in *Middlebrooks*, supra, at 342:

> [T]hat when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony.

The State relied on three (3) aggravating circumstances in this case. (1) That the murder was committed to avoid, interfere with or prevent the wrongful arrest or prosecution of defendant or another; (2) Previous conviction of a violent felony (voluntary manslaughter), and; (3) Murder committed during robbery. The jury did not find that the murder was committed to avoid prosecution. Under the *Middlebrooks* rule the aggravating circumstance concerning the underlying felony must be eliminated. This leaves one aggravating circumstance remaining, previous conviction of a violent felony, in this case voluntary manslaughter. The court has no way of knowing whether the jury would have imposed the death penalty had they not been permitted to consider this evidence [of the eliminated circumstance] in their weighing process."

In *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), this Court conducted a harmless error analysis and found that the sentencing jury's consideration of the invalid felony-murder aggravating circumstance was harmless beyond a reasonable doubt because the evidence supporting the remaining aggravating factor of prior violent felony convictions was undisputed and overwhelming and the verdict would have been the same had the jury given no weight to the invalid felony murder aggravating factor.

While the mitigating evidence in this case was comparable to that found to be inadequate in *Howell*, the prior violent felony aggravator was not nearly as positive. Defendant was indicted for first degree murder and found guilty of voluntary manslaughter. While this is, as instructed by the trial judge, conviction of a violent felony we have no way of knowing and cannot speculate whether the jury would have imposed the death penalty with one of the two aggravating circumstances withdrawn from their consideration and with the necessity of weighing the one remaining aggravating circumstance against the mitigating circumstances.

We have considered each of the issues raised by defendant on this appeal and find none to warrant reversal. For the guidance of the trial court on remand we note that defendant was not entitled to jury instructions under the provision of the 1989 Criminal Code. This Court, as well as the United States Supreme Court, has held many times over that Tennessee's Capital Sentencing Statutes are constitutional. *State v. Black*, 815 S.W.2d 166 (Tenn.1991). The issue of the constitutionality of the Tennessee Capital Sentencing Statutes under Article 1, Sec. 32 of the Tennessee Constitution was settled in *State v. Brimmer*, supra.

Defendant's judgment of conviction in each case is affirmed. For the reasons set out herein the case is remanded to the trial court for the purpose of resentencing in accordance with this opinion.

ANDERSON, C.J., concurs separately.

DROWOTA and BIRCH, JJ., concur.

REID, J., concurs and dissents separately.

DROWOTA and BIRCH, JJ., also join in the separate concurring Opinion by ANDERSON, C.J.

ANDERSON, Chief Justice, concurring.

I concur in the majority's decision that the conviction in this case should be affirmed. I also agree with both the majority and the dissent that the *Middlebrooks* error in this case requires a remand for re-sentencing. I write separately because I disagree with the

majority's rationale for affirming the conviction.

At trial, four out-of-court statements made by co-defendants Danny Branam and Ernest Walker were admitted without objection by the defendant under the co-conspirator exception to the hearsay rule. The majority concludes that admission of the statements was error, but that the error was harmless and does not require reversal. After reviewing the record, I conclude that appellate review of the issue has been waived as a result of the defendant's tactical decision not to object at trial.

As the State points out, it is a well-established rule that a defendant's failure to timely object to the introduction of evidence constitutes a waiver of appellate review of the issue. Tenn.R.App.P. 3(e); 13(b) & 36(a); *see also State v. Harrington,* 627 S.W.2d 345 (Tenn.1981); *State v. Gregory,* 862 S.W.2d 574 (Tenn.Crim.App.1993); *State v. Killebrew,* 760 S.W.2d 228 (Tenn.Crim.App.1988). Indeed, Rule 36(a), Tenn.R.App.P., specifically directs that relief on appeal need not be granted "to a party responsible for an error or [to a party] who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."

In this case, the defendant failed to interpose an objection to the admission of the statements even though the trial judge specifically inquired if the defense objected before admitting the evidence now challenged as error. Thus, the trial judge had no opportunity to rule on the evidence that the defendant now claims was admitted in error.

In criminal cases, however, appellate courts have been given additional authority to consider issues otherwise waived under the principle of "plain error." Rule 52(b), Tenn.R.Crim.P. provides:

> (b) Plain Error.—An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.

The dissent concludes that the issue of the admissibility of out-of-court statements made by co-defendants Branam and Walker was not waived because defense counsel argued that the State had introduced an altered copy of the transcript during trial without informing defense counsel of the alterations. Assuming the issue was waived due to defense counsel's failure to object, the dissent then concludes that the principle of plain error applies and overturns the conviction after further concluding that the plain error was not harmless.

After carefully reviewing the record, I disagree. First, the record does not support the dissent's characterization of defense counsel's argument during the hearing on the motion for new trial as an objection to admission of the tape. Defense counsel was objecting to the State's use of one certain version of the transcript of the tape. Counsel never objected to admission of the tape itself, which was the evidence, as the trial court repeatedly instructed the jury.

Because defense counsel did not object to admission of the tape or any of the hearsay statements now assigned as error, review of the issues is precluded unless the plain error rule applies. However, it is well-established that plain error rule is not applicable when the record reflects that a defendant made a deliberate, tactical choice to waive an objection. *State v. Ogle,* 666 S.W.2d 58 (Tenn. 1984) (stating that the plain error rule does not apply when the defendant intentionally waives an objection for tactical reasons). *See also People v. Collins,* 730 P.2d 293, 305 (Colo.1986); *State v. Ross,* 230 Conn. 183, 646 A.2d 1318, 1338 (1994); *Jones v. United States,* 477 A.2d 231, 242 (D.C.1984); *Ferguson v. State,* 642 A.2d 772, 780 (Del.1994); *State v. Brown,* 138 N.J. 481, 651 A.2d 19, 45 (1994); *State v. Claytor,* 61 Ohio St.3d 234, 574 N.E.2d 472 (1991); *State v. Bullock,* 791 P.2d 155, 159 (Utah 1989); *Henry v. State,* 861 P.2d 582, 589 (Alaska App.1993); *Ellington v. Bilsel,* 255 Ill.App.3d 233, 193 Ill.Dec. 353, 358–59, 626 N.E.2d 386, 291–92 (1993); *State v. Vineyard,* 839 S.W.2d 686, 693 (Mo. App.1992); *State v. Crislip,* 110 N.M. 412, 796 P.2d 1108, 1113 (App.1990); *State v. Collier,* 30 Or.App. 951, 569 P.2d 38, 39 (1977); *United States v. Valencia–Lucena,* 925 F.2d 506, 514 (1st Cir.1991); *United States v. Mil-*

*ler,* 666 F.2d 991, 998 (5th Cir.1982). In discussing the rule in the context of a *Bruton* violation, the Court in *Ogle,* stated that

> when the defendant who is incriminated by such a co-defendant's statement fails to object at trial to the admission of that statement, his conviction may be reversed on that ground **only if** (1) the statement constitutes plain error, (2) the statement was an important part of the state's case, **and (3) the objection was not intentionally waived for tactical purposes.**

*Id.,* 666 S.W.2d at 60 (emphasis added) (citations omitted). Applying that rule in *Ogle,* the Court recognized the *Bruton* violation as plain error and reversed and remanded for a new trial. In so holding, the *Ogle* court rejected the State's assertion that the *Bruton* violation was not raised for tactical reasons *because the assertion was not supported by the record and was based instead on mere speculation.* The Court emphasized that "[w]hether or not an appellate court should recognize the error and grant relief in the absence of an objection in the trial court must depend upon the facts and circumstances of the particular case." *Id.* at 61.

In this case, the record clearly demonstrates that the defendant made a deliberate tactical decision not to object to admission of the tape at trial. In fact, counsel for the defendant in arguing the motion for new trial flatly stated, "I made a tactical decision to let that tape in." The dissent characterizes that decision as "absurd." On the other hand, the trial judge says it was "well thought out." In ruling on the motion for new trial, the trial judge said of the defendant's tactical decision to admit without objection the tape recorded conversation:

> The strategic decision to let it in was clear. The strategy was well thought out in this court's opinion because the entire theory of the defense was—is that Ray Elliott was the leader in this crime. He's the one that fashioned it. He's the one that sent the henchmen to conduct the crime, and may have been one of them himself under the theory of this defendant. In order to facilitate that theory you have got to put this tape into evidence so one can have an opportunity to cross-examine Naomi Ruth

Elliott, and in order to set up your theory as to how she was likewise involved at least in knowledge of this—these criminal activities.

It is difficult to conceive of evidence more probative of an attorney's reason for not objecting than the attorney's own statement. Whether a second-guessing appellate court thinks a tactical decision is inspired or poor is not the issue on direct appeal. The issue is whether the action, or in this case, the inaction, was the result of a deliberate, tactical decision. The plain error rule is clearly not applicable when the defendant makes a deliberate tactical choice to waive an objection.

The plain error rule "should not be used to provide a second bite at the apple for a defendant whose deliberate trial strategy failed." *United States v. Valencia–Lucena,* 925 F.2d at 514. To apply the plain error rule under such circumstances would encourage defense counsel to gamble for a favorable verdict, and should the verdict be unfavorable, resort to appeal on errors which might have been obviated on objection. *United States v. Campbell,* 419 F.2d 1144, 1145 (5th Cir.1969).

Where, as here, the record clearly reflects that the defendant's failure to object was a tactical decision, waiver applies and appellate review is foreclosed. Accordingly, I concur in the majority's decision affirming the defendant's conviction for first-degree felony murder, but do not reach the question of whether the challenged statements were admissible under the co-conspirator exception to the hearsay rule. In my view that issue has been waived.

DROWOTA and BIRCH, JJ., concur.

REID, Justice, concurring and dissenting.

I concur in the majority's decision that the *Middlebrooks* error in this case requires a remand for resentencing. I also concur in the majority's finding, but not its rationale, that the statements of the defendant's two co-defendants were not admissible under the co-conspirator exception to the hearsay rule. I dissent from the majority's conclusion that the error in admitting the co-defendants'

statements was harmless error. I also disagree with the view expressed in the concurring opinion that review pursuant to Rule 52(b), Tennessee Rules of Criminal Procedure, is precluded. I would reverse the conviction and remand the case for a new trial on the issue of guilt.

### Inadmissible Hearsay Evidence

The error which, in my view, requires the reversal of the conviction is the admission of four out-of-court statements made by co-defendants Danny Branam[1] and Ernest Walker[2]. The trial court admitted the hearsay evidence under the exception for declarations made by co-conspirators. The defendant contends that the exception is not applicable because the statements were made almost two years after the offenses were committed and long after the conspiracy among the defendants had terminated. The majority finds error but saves the conviction by finding the cumulative errors harmless. The concurring opinion finds that the defendant's counsel, as a tactical maneuver, deliberately allowed the hearsay statements, in which the defendant is identified as the trigger man at the scene of the homicide, to be admitted into evidence, and that the defendant, therefore, cannot rely upon the error on appeal.

In this case, whether the defendant was present at the scene of the crime was an important issue on guilt or innocence; the identity of the person who shot the victim was the critical issue on punishment. Inadmissible hearsay evidence placed the defendant, Tommy Joe Walker, his brother, Ernest Walker, and their nephew, Danny Branam, at the scene of the robbery and murder. This testimony was given by Naomi Elliott, sister of the Walker brothers and the State's essential witness, and her husband, Ray "Spec" Elliott, the owner of the automobile and weapon used in the commission of the crimes.

A brief review of the evidence shows the importance of the hearsay erroneously admitted. It was substantially more than mere "corroboration of defendant's own admissions." Majority opinion, p. 386.

Ray and Naomi Elliott, who also were suspects in the case, testified that on the date of the murder, July 22, 1987, Tommy Joe Walker, Ernest Walker, and Danny Branam borrowed Ray Elliott's 1980 Fleetwood Cadillac and took, without Elliott's permission, his 9 mm. handgun for the stated purpose of going to Sweetwater "to try to make some money." Later that night, Elliott's automobile, occupied by three men, one of whom, according to witnesses, resembled Danny Branam, was parked at the victim's place of employment in Sweetwater, a livestock market owned by the victim's family. Shortly before the victim left the market for her residence in Knoxville, Elliott's automobile was seen leaving its parking place at the market. The hearsay statements, pieced together, are evidence that when the victim arrived at her residence, Tommy Joe Walker, Ernest Walker, and Danny Branam were waiting for her. She resisted the robbery and was shot several times with Elliott's weapon.

The majority finds that the trial court erred in admitting, as part of the State's evidence-in-chief, four out-of-court statements made by Ernest Walker and Danny Branam to Naomi Elliott, which together indicate that the defendant was the person who fired the fatal shots. The majority in ruling the hearsay evidence harmless, bases the conviction on the testimony of Danny Branam's brother, Jackie Lynn Dawson; Peter Talarico, one of the defendant's fellow inmates at the Tennessee State Penitentiary in Pikeville (Brushy Mountain); and Terry Bowling, a convicted felon and friend of the defendant and Ray Elliott. None of these three witnesses gave any direct evidence regarding the crime. Each testified that the defendant confessed to him that he shot the victim. The majority's view that the inadmissible hearsay is harmless, is at odds with the finding by the trial court. On the motion

1. *State v. Branam*, 855 S.W.2d 563 (Tenn.1993) (conviction affirmed; sentence reversed).

2. *State v. Ernest Jay Walker*, No. 03C01–9110–CR–00346, 1993 WL 44195 (Tenn.Crim.App., Knoxville, February 22, 1993) (interlocutory appeal remanding case to trial court) (Ernest Walker eventually pled guilty).

for new trial, the trial judge stated that the hearsay statements made by Danny Branam were the "heart and [soul] of the case." Yet, the majority finds beyond a reasonable doubt that it did not affect the verdict.

The statement found by the trial judge to be critically important was tape recorded. The recording was of very poor quality. Four transcripts were made of the tape. None of the transcripts were the same. The hearsay statement as reported in the first three transcripts did not definitely incriminate the defendant. However, the fourth transcript, which was prepared by the prosecuting attorneys, places the defendant at the scene of the crime. Defense counsel used the non-incriminating version throughout the trial until the State's critical witness, Naomi Elliott, was called to testify. A few minutes prior to her taking the stand, the prosecuting attorney handed defendant's counsel the revised version. The record shows dramatically that defendant's counsel was not aware that the transcript had been revised until the prosecution referred to the incriminating portion several times in rebuttal closing argument.[3]

This first and most prejudicial of the inadmissible statements was a recording of the conversation between Branam and Naomi Elliott made nearly two years after the murder while Branam was incarcerated at Brushy Mountain on other charges. At that time, Ray Elliott had been charged with being an accessory before the fact of the murder of the victim. To help her husband make a deal with the prosecution, Naomi Elliott agreed to record a conversation with her nephew, Danny Branam, when she visited him at the prison. During the conversation, Elliott told Branam that her husband had been arrested and that the police were "on to something" and that someone was talking about what happened when the victim was killed. The first three versions of the defective recording did not definitely incriminate the defendant; however, according to the prosecution's revised version of the transcript, which as discussed earlier was presented to the defense

counsel late into the trial, statements made to Elliott by Branam asserted that the defendant had been present when the victim was shot. But even the revised version of the tape did not establish the identity of the actual killer, who was referred to only as "he." The tape and the revised transcript of the tape were admitted into evidence during the State's direct examination of Naomi Elliott.

On cross-examination of Naomi Elliott, who, apparently was also unaware that the prosecution's revised version of the transcript included the assertion that the defendant was present at the scene, the defendant's counsel pointed out that the ambiguous references on the tape to "he" and "us" could be interpreted as references to Branam, Ray Elliott, and Naomi Elliott rather than to Branam, Ernest Walker, and the defendant. But, on redirect, Naomi Elliott provided the missing identification of the person who fired the fatal shots with *another* hearsay statement. When asked by the State how she knew to whom "us" referred to and "what happened out there that night," she did not rely upon the tape recorded conversation with the defendant. Instead, she stated, the second inadmissible hearsay statement, that three or four days after the murder, Danny Branam, in response to Ray Elliott's remark that he had heard nothing on the news about a woman being killed, said, "Yeah, T.J. [the defendant] shot her." She testified that Branam also told them at that time, that they needed to get rid of the weapon, and that later he told her, the third inadmissible hearsay, that the defendant had approached the driver's side of the victim's automobile and had shot her when she reached for her weapon.

Naomi Elliott then reinforced the point by testifying, the fourth inadmissible hearsay, that in 1989, after her husband had been released from jail, Ernest Walker gave her an account of the murder in which the defendant was the person who did the shooting. According to her testimony, Ernest Walker told her that while he was sitting in Elliott's

---

**3.** The majority opinion rejects the defendant's assignment of error that revising the transcript of the tape was prosecutorial misconduct, apparent-

ly on the ground that it was, at most, harmless error.

automobile he heard shots and saw the defendant beside the door of the victim's automobile. Her testimony was that, based on these accounts of the killing related to her by Danny Branam and Ernest Walker, she interpreted the otherwise uncertain references to "he" and "us" on the tape to mean the defendant, Ernest Walker, and Danny Branam and the indefinite references to the killer to indicate the defendant. During rebuttal closing argument, the State relied on its version of the transcript of the tape to argue that the defendant was present at the scene of the crime, and relied on the other hearsay statements to argue that he was the one who shot the victim.

### Co-conspirator Exception

I concur in the majority's finding that the four hearsay statements were not admissible under the co-conspirator exception to the hearsay rule, but base my conclusion on a different rationale. Tennessee Rule of Evidence 803(1.2)(E) provides that the hearsay rule does not exclude a "statement offered against a party that is ... a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." For a declaration to be admissible under this Rule, certain conditions must be met. First, there must be independent proof of the existence of the conspiracy and the connection of the defendant and the declarant to the conspiracy. *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn.Crim.App.1992). On this point, I concur with the majority that whether a conspiracy had been entered into should be determined under the law existing at the time the statements were made, i.e., Tenn.Code Ann. § 39–1–601 (1982). This is particularly true because it is "the substantive law of crimes

that governs the admissibility of conspirators' declarations against other members of the conspiracy." Neil P. Cohen et al., *Tennessee Law of Evidence*, § 803(1.2).6, at 404 (2d ed. 1990); *see also Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir.1926) (co-conspirator's declarations are admitted upon "the substantive law of crime"). Therefore, even though Tenn.Code Ann. § 39–12–103 (Supp.1989) was in effect at the time of the trial, I would determine the existence of the conspiracy under the statute in effect at the time the conspiracy occurred. Applying this law, I find, as does the majority, that the evidence in the record established the existence of a conspiracy in this case. *See State v. Stamper*, 863 S.W.2d 404 (Tenn.1993).

A second requirement for the admission of a co-conspirator's declaration is that the declaration must be made "during the course of the conspiracy." If the conspiracy either had not yet begun or had ended at the time the statement was made, the declaration is inadmissible. *Owens v. State*, 84 Tenn. 1 (1885); *Sweat v. Rogers*, 53 Tenn. 117 (1871); *State v. Gaylor*, 862 S.W.2d at 554. A conspiracy may continue after the crime that was its object has been completed for, among other purposes, the concealment of the crime or to prevent witnesses from testifying. *State v. Crabtree*, 655 S.W.2d 173, 178 (Tenn.Crim. App.1983).[4]

The final condition for admission of a co-conspirator's declaration is that the statement must be made in furtherance of the conspiracy. In this regard, "the statements must somehow advance the objectives of the conspiracy, not merely inform the listener of the declarant's activities." *State v. Hutchison*, 898 S.W.2d 161, 170, n. 6 (Tenn.1994)

---

4. I find unsupported the statement of the majority that *State v. Crabtree* "has been totally abrogated by the current statute, Tenn.Code Ann. § 39–12–103, defining criminal conspiracy." To the contrary, § 39–12–103(e)(1) adopts the approach in *Crabtree:*

> Conspiracy is a continuing course of conduct which terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the

crime, and measures, other than silence, *for concealing the crime* or obstructing justice in relation to it. (Emphasis supplied.)

The *Crabtree* holding is not abrogated by subsection (g) of the same statute, which states only that "[n]othing in this provision is intended to modify the evidentiary rules allowing statements of co-conspirators *in furtherance of a conspiracy."* (Emphasis supplied.) This provision speaks only to the second prong of the evidentiary rule and not to the first, i.e., whether a conspiracy is ongoing at the time the declarations are made.

(quoting *United States v. Snider,* 720 F.2d 985, 992 (8th Cir.1983), *cert. denied,* 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984)). Casual or purposeless conversation or gossip about the crime does not meet this requirement, *State v. Hutchison,* 898 S.W.2d at 170; nor do "mere narratives of past successes and failures." *United States v. Tarantino,* 846 F.2d 1384, 1412 (D.C.Cir.1988), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988).

Many of the statements made by Branam during his recorded conversation with Naomi Elliott at Brushy Mountain were mere narrative and gossip about the crime and obviously were not made in furtherance of the conspiracy. These included the statement implicating the defendant in the killing and those containing the ambiguous references to "us" and "we" relied upon by the State to bring further statements by Branam and Ernest Walker before the jury. Even those statements made to further conceal the crime, such as his remarks to his aunt about how to mislead law enforcement officials regarding the weapon used in the killing and how he *would respond to further interrogation* by the police, were inadmissible because they were made long after the offenses had been committed and the primary conspiracy to rob the victim had terminated. Although some jurisdictions, including Tennessee, hold that a conspiracy may continue for the purpose of concealment, the rule that every conspiracy to commit an offense includes an implied subsidiary conspiracy to conceal evidence of the offense has been rejected by several jurisdictions. *See Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *State v. Rivenbark,* 311 Md. 147, 533 A.2d 271 (1987). Many courts have stated that admitting co-conspirators' statements made after achievement of the primary goal of the conspiracy would allow an intolerable expansion of the co-conspirator exception. As Justice Jackson commented in his concurrence in *Krulewitch,* it is

difficult to see any logical limit to the "implied conspiracy," either as to duration or means.... Conspirators, long after the contemplated offense is complete, after perhaps they have fallen out and become enemies, may still incriminate each other

by deliberately harmful, but unsworn declarations, or unintentionally by casual conversation out of court....

... If the law implies an agreement to cooperate in defeating prosecution, it must imply that [the agreement] continues as long as prosecution is a possibility, and prosecution is a possibility as long as the conspiracy to defeat it is implied to continue.

*Krulewitch v. United States,* 336 U.S. at 456, 69 S.Ct. at 724, 93 L.Ed. at 800.

It is also apparent that an extension of the co-conspirator exception to include remarks made long after the primary objective of the conspiracy has been reached, raises problems under the Sixth Amendment. *See Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Horton v. Zant,* 941 F.2d 1449 (11th Cir.1991), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). To avoid these substantial objections, a co-conspirator's statements made during subsequent efforts at concealment should not be admitted unless they are made at a time proximate to the commission of the principal crime that was the object of the conspiracy. *See People v. Childrous,* 196 Ill.App.3d 38, 142 Ill.Dec. 511, 520–21, 552 N.E.2d 1252, 1261–1262 (1990); *People v. Eddington,* 129 Ill.App.3d 745, 84 Ill.Dec. 887, 905, 473 N.E.2d 103, 121 (1984); *People v. Meagher,* 70 Ill.App.3d 597, 26 Ill.Dec. 800, 804, 388 N.E.2d 801, 805 (1979). For example, the statements admitted in the leading Tennessee case on this issue, *State v. Crabtree,* 655 S.W.2d 173 (Tenn.Crim.App.1983), were made only one month after the accomplishment of the principal offense. In contrast, the statements Branam made during his aunt's visit to Brushy Mountain occurred almost two years after the primary goal of the offense, the robbery of the victim, had been accomplished. These statements do not meet the requirement of temporal proximity and are therefore inadmissible under the co-conspirator exception to the hearsay rule.

I also find that the declarations of Danny Branam and Ernest Walker related by Nao-

mi Elliott on redirect examination were inadmissible. Those statements describing the defendant's participation in the crime, though seriously incriminating, were only narratives of past actions of the conspirators, not declarations made in furtherance of the conspiracy. Additionally, since Ernest Walker's statements, like Branam's recorded conversations, were made after the arrest of Ray Elliott in 1989, they do not meet the temporal proximity requirement for co-conspirator's statements made during the concealment phase of a conspiracy.

### Non-hearsay Purpose

The State argues that these statements were properly admitted in response to the defendant's cross examination of Naomi Elliott and implies that they were not admitted for their truthfulness but only to show how Naomi Elliott understood certain parts of Branam's recorded statement to refer to the defendant. Even this precarious basis must fail because no limiting instruction to this effect was given to the jurors, who were thereby permitted to consider as substantive evidence the bald, uncross-examined statements of non-testifying co-defendants that the defendant fired the shots that killed the victim. Under the circumstances, the admission of Branam's and Ernest Walker's statements raises Sixth Amendment concerns. *Cf. Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985); *State v. Stephenson,* 878 S.W.2d 530, 548–549 (Tenn. 1994) (in both cases, limiting instructions given to prevent jurors' misuse of hearsay statements prevented error under Sixth Amendment).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Likewise, Article I, Section 9 of the Tennessee Constitution provides, "That in all criminal prosecutions, the accused hath the right ... to meet the witnesses face to face." A prosecutor wishing to introduce evidence that would normally infringe on a defendant's confrontation rights under the state or federal constitutions must show that use of the evidence is necessary,

that the evidence carries its own indicia of reliability, and that the evidence is not crucial or devastating. *State v. Armes,* 607 S.W.2d 234 (Tenn.1980); *State v. Philpott,* 882 S.W.2d 394, 405–406 (Tenn.Crim.App. 1994). There was no such showing in the present case.

### Waiver

Given the finding that the statements of the co-defendants were not admissible under the co-conspirator exception to the hearsay rule or otherwise, the next issue is whether the error was waived by the defendant, as contended in the concurring opinion. The concurrence states, "appellate review of the issue [of whether admission of the hearsay was error] has been waived as a result of the defendant's tactical decision not to object at trial." Concurring opinion at p. 399. In justifying its holding, the concurrence states,

> In this case, the defendant failed to interpose an objection to the admission of the statements even though the trial judge specifically inquired if the defense objected before admitting the evidence now challenged as error. Thus, the trial judge had no opportunity to rule on the evidence that the defendant now claims was admitted in error.

Concurring opinion, p. 399[2]. However, a detailed review of the record shows that an objection was timely raised and the incriminating statements were not allowed in for tactical reasons.

Prior to the trial, the defense counsel objected to the allowance of hearsay statements on the ground that the conspiracy had terminated when the statements were made. Counsel asked for a pretrial hearing on "[w]hether otherwise hearsay statements or acts sought to be introduced into evidence by the State in this case were made in the course of and in furtherance of a conspiracy pursuant to which the State seeks to admit said statements." In discussing the motion immediately prior to the trial, the defense counsel stated, "If the Court wants to give us a pre-trial hearing on whether or not a conspiracy existed, we would like to have it.... We think that is a better way to do it than to introduce a statement and then find out later

that the Court does not believe a conspiracy existed." The trial court denied the motion, choosing instead to rule as the statements were introduced.

On the fourth day of trial, immediately prior to Naomi Elliott's critical testimony, the State provided the defense counsel with the new version of the transcript of the tape. Unknown to the defendant's attorney, a crucial phrase stating that the defendant "was there" had been added to the statement. The concurring opinion is apparently based on a finding that the defense was aware of this addition to the transcript, because it concludes that any objection to the out of court statements were waived "as a result of the defendant's tactical decision not to object at trial." Because a tactical decision implies knowledge of what is being introduced, a review of the record is necessary to determine not only whether an objection was made, but also whether the defense counsel was aware that the transcript included the statement that the defendant "was there."

The record shows that, initially, the Tennessee Bureau of Investigations (T.B.I.) transcribed the tape recording, and a copy of the transcript was given to the defendant. In the T.B.I. transcript, the statement at issue appeared as follows: "I don't think Jay and Joe would say nothing to me 'cause—(Inaudible) I think it is somebody on down the side. (Inaudible)". This is the transcript that the defense used to prepare its case. At the pretrial hearing, defense counsel was allowed to get a copy of the tape recording. He listened to the tape six times and his co-counsel listened to it six times and neither of them understood Branam to say that the defendant "was there." The defense then requested permission to get a court reporter to prepare a transcript. The court reporter transcribed the statement as "I don't think—to tell you the truth, I don't think Jay and Joe would say nothing. (Inaudible) They both know—(Inaudible)—burn their God damn ass." The defense had copies made of this transcript and delivered one to the State.

Subsequently, the prosecuting attorneys, using T.B.I. equipment, listened to the tape and prepared a transcript. The transcript they developed states, "I don't think—to tell

you the truth, I don't think Jay and Joe would say nothing. (Inaudible) They both know that's gonna burn their God Damn ass."

A description of what happened next is best described by defense counsel while arguing the motion for a new trial:

All right. So we start the trial on Monday. Thursday morning I'm handed a copy of a transcript that the State wishes to introduce. Well, this is Thursday morning now. We're fifteen minutes away from starting trial. So what I do is I take the State's transcript and take our transcript and [my co-counsel] and I run back here into the closet, and I start telling [him], "Look. Here's the points I want to make with Naomi. Let's compare transcripts to make sure we don't have a problem with it, to make sure I'm accurate in that part."

Well, I don't go to that part. I have no reason to go to that part. I don't know that there's an admission that my guy was in there.

However, the transcript presented to the defense on the morning of the fourth day of trial, on the same day it was to be introduced through Naomi Elliott, states: "I don't think—to tell you the truth, I don't think Jay and Joe would say nothing *'cause they were there*' and they both know that's going to burn their God damn ass." (Emphasis added.) The prosecutors had added the language " 'cause they were there and' in the place where the three previous transcripts had read (inaudible)."

The defense counsel requested that its version of the transcript also be submitted to the jury so that the jury could listen to the tape and decide which transcript was more accurate. The State objected to the defendant's transcript stating, "transcripts are admissible only through a witness who was present during the recording or a person who monitored the recording." The defense argued that it did not think that the State's version was accurate, and stated,

In order for it to come in, to begin with, you have got to find that this is a continuation of the conspiracy. You have got to find that he is a co-conspirator of mine;

that the conspiracy is still existing, still an on-going conspiracy. Kind of interesting, this is two years after it is over. The purpose, the object of the conspiracy is over—the robbery, murder, if that is what it is.

The trial court clearly accepted this argument as an objection to the admission of the tape, but overruled the objection, stating, "I am taking it, of course, there are statements in there, in an effort to conceal detection of the crime. I am accepting that as a given, now, General. In that view, the Court is of the opinion that the tape is admissible. I do not have a great problem with that." Clearly, the trial court considered the objection that the statements in the tape and transcript were inadmissible hearsay, and ruled that they were admissible under the co-conspirator exception because they were made in an effort to conceal detection of the crime.

When the tape and transcript were actually introduced by the State through the testimony of Naomi Elliott, the court asked whether there was an objection. The defendant's attorney, obviously realizing any further objection would be futile, replied, "No objection." A review of what followed establishes that even then the defense was not aware of the incriminating addition to the transcript.

On direct examination, after establishing how Naomi Elliott was wired for the recording and drove to Brushy Mountain, the State played the tape for the jury to hear, and the jury each was given a copy of the State's transcript to read. No questions were asked in reference to the incriminating portion of the statement. The record shows that during the cross-examination of Naomi Elliott, the defense counsel obviously was working from a transcript different from that supplied by the State.

Q: Thank you. It is my page seven and eight. They have got their's numbered differently. Let me find it on their transcript. . . .

The cross-examination consisted of the defendant's attorney going through his transcript, focusing on those statements that might suggest that it was Ray Elliott who was at the scene of the crime and who was an active participant, and those that indicated that Naomi Elliott would say anything to get her husband out of trouble.

On redirect examination, the State quoted a portion of the statement at issue, but oddly enough, omitted any reference to the additional language, "cause they were there," which, unlike the remainder of the statement, is truly incriminating. In referring to Danny Branam's statement on the tape, the prosecuting attorney quoted the court reporter's version:

Q: The reason why he asked you that is because he told you, "They know that, if they talk, that it would burn their goddamn ass."

A: Yes.

On recross examination, the defense focused on the fact that the tape did not establish the identity of the person who shot the victim.

Q: He didn't know you were wired. By the way, he never said T.J. shot her, did he?

A: Who?

Q: He never said T.J. dropped her, did he?

A: On this?

Q: Yes, ma'am.

A: No, I don't believe.

Q: So the only way we know that he said T.J. did it is because you said that, right?

A: Right. He said it other times.

Q: He said it other times. But the fifty-two pages of taped discussions about this incident with him, when he tells you the details, he never says T.J. did it, did he?

A: No.

The first time that the statement " 'cause they were there" was mentioned by the prosecutor, was in the State's *rebuttal* closing argument; there, the State referred to the phrase on five different occasions. The transcript of the closing arguments shows clearly that defense counsel was totally surprised by the addition to that statement:

State: Danny Branam is down on tape. Danny Branam says, . . . When she got the safety off, he bagged her, running around

the car." She had her seatbelt on, was still trying to turn around and shoot him.

"I don't think—to tell you the truth, I don't think Jay and Joe would say nothing, because *they were there,* and they both know that is going to burn their goddamn ass."

Ladies and gentlemen—

Defense Counsel: Your Honor, I object to that comment. I want the objection to be noted on the record. I would like a jury-out hearing where I could explain my—I am sorry—when the jury goes out—

State: Your Honor, we object to—

Defense Counsel: —I would like to explain it further.

State: — ... making an objection like this in front—

The Court: This is argument, ladies and gentlemen. Proceed.

(Emphasis added). And later, when given an opportunity to discuss his objection, the defense counsel states,

Well, actually, I misunderstood what he said. I thought he said—I will tell you honestly—and was giving his opinion that my client would not say that, because it would burn his ass. That was the objection. Then I got to looking at the transcript. I think he was reading from the transcript.

The quote relied upon by the concurrence— "I made a tactical decision to let that tape in"—when placed in context, does not support waiver. In context, the defense counsel was stating that had he been aware of the addition of the phrase "they were there," he again would have moved to suppress it.

At the sentencing hearing, the defense counsel, having reviewed the transcript and determined that the incriminating statement had been added, moved that the court declare a mistrial. This record, in my view, establishes beyond any doubt that the defendant did not tactically waive the right to object to the admission of the tape.

If the concurrence is referring to the other three hearsay statements which were introduced during the redirect examination of Naomi Elliott when it finds a tactical decision not to object, my response is similar; those statements also were included in the initial motion for a pretrial hearing to determine whether the hearsay statements were made in the course of a conspiracy. In my opinion, the record will not support the conclusion that the defendant did not object and the admission of the hearsay statements was a "well thought out" tactical decision.

The exchange between the trial judge and the defense counsel when the transcript and tape were actually introduced by the State does not show waiver. The trial judge inquired if there was an objection, to which defense responded in the negative. Case law holds that "this Court is not inclined to require counsel to make technical, argumentative or repetitious objections to issues which have already been ruled upon." *State v. McGhee,* 746 S.W.2d 460, 464 (Tenn.1988). In *McGhee,* the issue of whether a prior conviction was admissible was discussed at a "jury-out hearing," the trial judge held the conviction admissible and made a clear and definitive ruling. The accused then took the stand, and his counsel brought out the conviction on direct examination. On appeal, the Court held,

After the ruling had been made, clearly and unequivocally, in our opinion the issue was sufficiently preserved for further review on appeal without the making of any further objection.

*Id.* at 463. And in the case of *Goines v. State,* 572 S.W.2d 644, 649 (Tenn.1978), the Court stated,

The test must be whether the issue was fairly raised, or phrasing it another way, whether the trial judge was fairly apprised of petitioner's objection or given a reasonable opportunity to consider the matter.

It would be manifestly unjust to apply the waiver rule in this case where the petitioner, in advance of trial, fairly apprised the Court of the substance of his objection to the testimony and where on motion for a new trial the Court was again apprised of the petitioner's contentions.

Likewise, it is manifestly unjust to apply the waiver rule to the admission of the transcript of the tape in this case.

The only Tennessee case relied upon in the concurring opinion is *State v. Ogle,* 666 S.W.2d 58 (Tenn.1984), in which this Court found reversible error and remanded the case for a new trial. In *Ogle,* the State, without objection by the defendant, introduced the statement of a non-testifying co-defendant which incriminated the defendant. The Court set forth the circumstances under which the error could be considered on appeal:

> Although, as a general rule, the appellate courts of this State do not consider issues that are not raised in the trial court, *State v. Pritchett,* Tenn., 621 S.W.2d 127, 135 (1981), plain error is a proper consideration for an appellate court whether properly assigned or not. *State v. Mackey,* Tenn., 553 S.W.2d 337, 340 (1977), *Davidson v. State,* 223 Tenn. 193, 443 S.W.2d 457 (1969). Rule 52(b), Tennessee Rules of Criminal Procedure, states that an error affecting "the substantial rights of the accused" may be noticed at any time "where necessary to do substantial justice." Since a *Bruton* violation raises a "substantial threat" to the right to confront the witnesses against him, *Bruton* [v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ], such a violation clearly affects a "substantial right" and constitutes plain error which "went to the basis of fair hearing and trial. . . ." *Roberts v. Russell* [392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968) ].

*State v. Ogle,* 666 S.W.2d at 60. The Court's response to the State's insistence in the *Ogle* case, the defendant's counsel did not object to admission of the evidence for tactical reasons, was the following quote from the Court of Criminal Appeals:

> In the instant case, co-defendant Miller's confession clearly inculpated defendant Ogle, and it was obviously crucial to the case against Ogle. I cannot imagine any legitimate tactical reason for defense counsel's failure to object when an objection would have effectively destroyed the state's case.

*Id.* at 61 (quoting from Judge Martha Craig Daughtrey's dissent in Opinion of Court of Criminal Appeals). That language is emi-

nently applicable to the case before the Court.

Because the defendant's theory of the case, which was developed through the witnesses and in closing argument, was that it was Ray Elliott who was at the scene of the crime and not the defendant, and because the prosecution brought in a revised transcript which absolutely squelched the defendant's case on the fourth day of trial, and because the defense was not aware of this prior to the rebuttal closing argument, it is not appropriate to find that the defense "waived" its objection to the tape and transcript.

### Plain Error—Ineffective Assistance of Counsel

Even had counsel knowingly failed to object, the addition to the transcript that the defendant "was there," would make its admissibility plain error. As stated in *State v. Ogle,* the evidence "was obviously crucial to the case against [the defendant]. I cannot imagine any legitimate tactical reason for defense counsel's failure to object when an objection would have effectively destroyed the state's case." *State v. Ogle,* 666 S.W.2d at 61.

The same conclusion must be reached concerning the other three statements. As stated, the ultimate issue in this case was the identity of the person who fired the fatal shots. The only hearsay testimony by Naomi Elliott which could have helped the defendant was a statement by Branam or Earnest Walker that she or her husband killed the victim. Expecting such testimony would be absurd. Allowing the admission of such testimony without objection would constitute ineffective assistance of counsel.

The United States Supreme Court has defined two requirements for a finding that a defendant did not receive the effective assistance of counsel: (1) that counsel's performance was deficient to the degree that counsel was not functioning as the Sixth Amendment envisioned; and (2) that the deficient performance prejudiced the defense effort. *Strickland v. Washington,* 466 U.S. [668] at 687, 104 S.Ct. [2052] at 2064 [80 L.Ed.2d 674 (1984) ]. The second "requires showing that coun-

sel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687, 104 S.Ct. at 2064. To prove deprivation of a fair trial, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068. If counsel's performance was in some way deficient, but a defendant cannot prove the deficiency prejudiced his defense, then any deficiency is deemed "harmless error," and counsel will not be held to be ineffective. 466 U.S. at 692, 104 S.Ct. at 2067.

*Hartman v. State*, 896 S.W.2d 94, 104 (Tenn. 1995). If defendant's counsel had not objected to the recording of a known perpetrator of the crime stating that the defendant was at the scene of the crime, and had allowed out-of-court statements that the defendant was the trigger man, this representation under *Strickland* would constitute the ineffective assistance of counsel and require reversal of the conviction.

This was not a situation in which counsel took a calculated risk which would foreclose subsequent review under the plain error rule. Failure to object for tactical purposes assumes some reasonable expectation of possible benefit. Where there is no reasonable expectation of possible benefit, the admission of highly prejudicial evidence relevant to the essential issue in the case—the identity of the person who fired the fatal shots—was plain error affecting the substantial rights of the defendant and may be noticed on appeal. Under Rule 52 of the Rules of Criminal Procedure,

> An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.

See also Tenn.R.App.P. 13(b).[5] Furthermore, "[i]n death penalty cases ... this Court is required by statute to review the sentence and to consider significant errors whether or not called to the attention of the trial court." *State v. Martin*, 702 S.W.2d 560, 564 (Tenn.1985). Indeed, this Court has consistently held that the rule that a defendant's failure to timely object to the introduction of evidence constitutes a waiver of appellate review, does not apply to substantial constitutional errors in cases "involving the deprivation of life and liberty." *Veach v. State*, 491 S.W.2d 81, 83 (Tenn.1973); *see also State v. Goins*, 705 S.W.2d 648, 650 (Tenn.1986).

In summary, the record compels the conclusion that the defendant did not waive the admission of the hearsay evidence, and even if he had waived it, admission of this testimony was plain error under Rule 52, Tenn. R.Crim.Proc., and requires review by this Court.

### Prejudicial or Harmless Error

The next question then is whether admission of the co-defendants' statements was harmless error beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The majority holds that admission of the co-defendants' statements was harmless because other witnesses testified to incriminating statements made to them by the defendant. I would point out that the credibility of all of the other witnesses who testified that the defendant had admitted killing the victim was strongly challenged. *See Hartman v. State*, 896 S.W.2d 94, 104 (Tenn.1995). Of these witnesses, Ray Elliott was a suspect in the murder. A description of the driver of the Cadillac at the livestock market on the night of the killing matched his appearance. His weapon and his automobile were used in the killing. Naomi Elliott, obviously, was determined to help her husband avoid prosecution. Likewise, the credibility of the three other persons who testified that the defendant had confessed his participation in the

---

**5.** "The appellate court ... may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process."

homicide was at issue. Terry Bowling was a convicted felon and an associate of Ray Elliott. Jackie Dawson is Danny Branam's brother, his mental capacity was questionable and his direct testimony consisted almost entirely of leading questions by the State. Peter Talarico was an inmate at the state penitentiary and an admitted "snitch."

Critical to the credibility of all these witnesses was the March 1989 statement of Danny Branam, in the words of the prosecutor, "the man who was there" the night the victim was shot. And critical to an understanding of Branam's testimony were the statements of Branam and Ernest Walker to Naomi Walker. The record confirms the evaluation of the tape recording given by the trial judge himself: it was "the heart and [soul] of the State's case." Without its admission, none of the other statements by the co-defendants could have been admitted, and the credibility of the other witnesses testifying that the defendant had admitted that he was the triggerman would have been significantly weakened. The tape presented to the jury the actual words of the only person who admitted being present when the robbery and murder were committed. This aspect of the taped statements was emphasized by the State during closing argument.

In *Chapman v. California* the Supreme Court held that

constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless.... [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*Chapman v. California,* 386 U.S. at 24, 87 S.Ct. at 828. In *Chapman,* the Court found it "completely impossible ... to say that the State has demonstrated, beyond a reasonable doubt, that the [error] did not contribute to petitioners' convictions," and consequently, remanded the case for a new trial. *Id.* at 26, 87 S.Ct. at 829.

The United States Supreme Court recently imposed a further limitation on excusing constitutional error as harmless. In *O'Neal v.*

*McAninch,* —— U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995). The Court stated:

When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict," that error is not harmless. And, the petitioner must win.

*Id.* at ——, 115 S.Ct. at 994. This issue was addressed in the dissent in *State v. Nichols,* 877 S.W.2d 722, 742 (Tenn.1994) (Reid, C.J., dissenting):

Errors not rising to the level of a constitutional rights deprivation are judged for harm or prejudice under Rule 52(a) of the Tennessee Rules of Criminal Procedure and Rule 36(b) of the Tennessee Rules of Appellate Procedure. In several important ways, the test for harmlessness of constitutional errors differs from that for nonconstitutional errors. First, once a constitutional error is found, the burden shifts to the state to prove that it is harmless; the burden does not shift to the state for the nonconstitutional errors. Second, the reviewing court must be persuaded "beyond a reasonable doubt" that the error did not affect the trial outcome in order to deem the error harmless—a stricter standard of persuasion than for nonconstitutional error. Finally, a most significant difference is that some constitutional errors never can be deemed harmless, whereas any nonconstitutional error may be considered harmless in a particular case. [James C. Scoville, Comment, *Deadly Mistakes: Harmless Error in Capital Sentencing,* 54 U.Chi.L.Rev. 740, 741–42 (1987).]

In *Sochor v. Florida,* 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), the Supreme Court concluded that an appellate court cannot fulfill its obligations of meaningful review by simply reciting the formula for harmless error. Justice O'Connor, concurring, observed that:

In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we held that before a federal constitutional error can be held harmless, the review-

ing court must find "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, at 24, 87 S.Ct. at 828. This is a justifiably high standard, and while it can be met without uttering the magic words "harmless error," see *ante* [504 U.S. at 539–540, 112 S.Ct.] at 2122–2123, the reverse is not true. An appellate court's bald assertion that an error of constitutional dimensions was "harmless" cannot substitute for a principled explanation of how the court reached that conclusion.

*Id.*, 504 U.S. at 541, 112 S.Ct. at 2123 (O'Connor, J., concurring).

On this record, the finding that admission of the statements was harmless when tested against these standards is, in Justice O'Connor's words, only a "bald assertion."

### Conclusion

I agree with the majority that the hearsay evidence was not admissible. I would find that the evidence was admitted over the defendant's objections and, further, its admission was plain error. I would hold that the State has not carried the burden of showing the erroneous admissions of evidence were harmless beyond a reasonable doubt and would, therefore, remand the case for a new trial.