IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JULY 1998 SESSION

STATE OF TENNESSEE,      )
                         )
          Appellee,      )      No. 03C01-9708-CC-00326
                         )
                         )      Blount County
v.                       )
                         )      Honorable D. Kelly Thomas, Jr., Judge
                         )
ROBERT JAY BRIDWELL,     )      (Aggravated assault)
                         )
          Appellant.     )

**FILED**

September 15, 1998

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

For the Appellant:

Mack Garner
District Public Defender
419 High Street
Maryville, TN 37801
(AT TRIAL AND ON APPEAL)

C. Michael Robbins
3074 East Street
Memphis, TN 38128
(ON APPEAL)

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
          and
Georgia Blythe Felner
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Michael L. Flynn
District Attorney General
          and
Kirk Andrews
Assistant District Attorney General
Blount County Courthouse
Maryville, TN 37804

OPINION FILED:_____


CONVICTION AFFIRMED


Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Robert Jay Bridwell, appeals as of right from his conviction by a jury in the Blount County Circuit Court for aggravated assault, a Class C felony. The trial court sentenced the defendant as a Range I, standard offender to four years, with the defendant to serve one month in the county jail followed by three years and eleven months on intensive probation. It imposed a fine of seven thousand five hundred dollars. The defendant contends that the evidence is insufficient to support his conviction as the assailant and that the trial court erred by denying full probation. We hold that the evidence is sufficient and that the trial court properly sentenced the defendant. We affirm the judgment of conviction.

Oliver Margetin, the victim of the assault, testified that he was driving home from a friend's house on June 15, 1996. He stated that his wife was a passenger in his truck. He said that when he was stopped at a traffic light, a Mazda truck with two occupants inside drove beside him in the left turn lane. He described the driver as a young, black male having a tall Afro and the passenger as having an Afro but not as tall as the driver. He stated that he had his window down and that the occupants of the truck, whom he did not know, began making crude, sexual remarks and gestures to him and his wife. The victim testified that he yelled at the occupants to shut up and to leave them alone. He stated that the passenger continuously asked him if he had a problem. He said that the truck turned off the road but that it drove behind him approximately one minute later when he was stopped at another traffic light. The victim stated that he became worried because he did not know what the occupants of the truck were going to do. He said that he saw through the mirror that the occupants were moving their hands.

The victim testified that he moved into the right lane and the truck drove up beside him in the left lane, approximately four or five feet away. He said that it

concerned him when the truck moved beside him.  He testified that the passenger asked him if he had called him a "punk," and he replied, "no."  He said that he tried to ignore the occupants of the truck and told them to shut up and to leave them alone.  He testified that when he looked over, the juvenile pulled out a gun from his right side and pointed it out the window at him.

The victim testified that he became afraid that he or his wife would be shot.  He stated that he grabbed his wife and threw her to the floorboard of the truck.  He said that he panicked, accelerating quickly leaving the truck behind.  He stated that he saw the truck turn left onto a street shortly after the traffic light.  The victim testified that his wife then called 911 from their cellular telephone, and he pulled into a shopping center to wait for the police to arrive.

The victim testified that he later went to the police station and that he identified the defendant and Jason Stallings, a juvenile friend of the defendant, as the occupants of the truck and the defendant as the person who pointed the gun at him.  The victim also identified the defendant and Stallings at trial.  The victim said that although it was dark when the assault took place, there were street lights and he got a good look at the occupants of the truck.  The victim identified a gun that looked similar to the one that the defendant pointed at him.  On cross-examination, the victim testified that the person who asked him if he had called them punks was the same person who pulled the gun out and pointed it at him.  He said that it made him angry and frustrated when the defendant made the sexual remarks and gestures.  He denied calling the defendant or Stallings names.

Gina Margetin, the victim's wife, testified that the defendant and Stallings were in a red Mazda truck.  She said that they yelled very bad things at her and cursed them.  Ms. Margetin testified that her husband became upset and told the defendant

3

and Stallings to shut up. She stated that she was hysterical, crying and scared for her life when the defendant pulled a gun from the front of the truck and pointed it at them. She said that the defendant held the gun towards her husband for approximately thirty to forty seconds. She stated that the defendant said, "I've got a gun, I'll kill you." She said that she also heard something said about stopping the truck. She testified that her husband told the defendant and Stallings to leave them alone. Ms. Margetin testified that she then called 911. She identified the 911 tape, and it was played for the jury. She described the gun as a black gun with a semi-long barrel.

Officer James Wilson of the Maryville Police Department testified that on June 15, 1996, at approximately midnight, he received a call to be on the lookout for a truck in the area that he was patrolling and was given a description of the truck and its occupants. He said that soon afterwards, he saw a red Mazda truck matching the description of the truck drive past him traveling approximately fifteen to twenty miles per hour. He stated that two people were in the truck. Officer Wilson testified that he turned around and followed the truck. He said that when another officer arrived, they turned on their blue lights to stop the truck. He stated that the truck stopped, and they ordered the occupants to get out of the truck. Officer Wilson identified the defendant as the passenger. He said that the defendant was reluctant to get out of the truck. He stated that the defendant eventually got out of the truck and that at one point, the defendant stuck his hands in the air, danced around, and shook his buttocks. Officer Wilson testified that other officers arrived and the defendant was arrested. He stated that the officers searched the truck and found a loaded, nine-millimeter semi-automatic gun in the rear portion of the truck between the driver's seat and the passenger's seat lying on top of some items. He said that a clip was not in the gun but that a clip was found in the glove compartment, which was unlocked and one bullet was loaded into the gun's chamber.

4

Detective William Manuel of the Maryville Police Department testified that on June 15, 1996, he received a call from Officer James Wilson to come to the police station. He said that Officer Wilson told him what happened. He said that he conducted a show-up lineup in the lobby of the police department and that the victim identified the driver of the vehicle and identified the defendant as the person who pointed the gun at him. Detective Manuel testified that he questioned the defendant after reading him his rights and that the defendant said that he did not recall the incident. He said that the defendant told him that he had been to a carnival. He described the defendant as arrogant.

Jason Stallings, a friend of the defendant, testified that he was seventeen years old and that he had known the defendant approximately a month and a half when the offense occurred. He stated that they had spent the day together and had left a carnival. He said that he was driving a friend's red Mazda truck. He conceded that the defendant had a gun with him and that the defendant had put it behind the passenger's seat. Stallings said that he saw a white truck with a male driver and a female passenger while they were in the left turn lane at a traffic light. He said that he heard someone make a racist remark. He stated that he turned left and then asked the defendant whether he heard what was said and the defendant told him that he had not. Stallings testified that he decided to turn back onto the road to get behind the truck and ask the occupants if they had called them racist names. He stated that he pulled behind the truck and that when the light turned green, the truck accelerated quickly. He said that he pulled beside the truck and he and the defendant asked the occupants of the truck whether they had said anything to them at the red light. Stallings testified that the driver responded, "yes," cursed them, and called them racist names again. He said that he and the defendant yelled at the driver.

5

Stallings said that he was not very angry but that the defendant was upset and the other driver was angry. He stated that shouting took place for approximately fifteen to twenty-five seconds. He said that he sped up as the defendant started to pull the pistol from behind the seat. Stallings testified that the defendant reached behind the seat and pulled the gun over his right shoulder and laid it on his lap. He stated that the defendant and the occupants of the truck continued talking as he drove. He said that the white truck accelerated each time he tried to go faster. Stallings testified that the defendant opened the glove compartment, removed the clip, and put the clip beside him. He stated that when he came to the next red light, he turned left and the white truck went straight. He said that the defendant then put the gun behind the seat and the clip into the glove compartment. He stated that he continued to drive. He said that the defendant was cursing and that he told the defendant to calm down. The police stopped them shortly afterwards. Stallings conceded that he lied to the officers when he told them his name, age and birth date. He explained that he had escaped from custody and did not want to get caught by the police.

Stallings testified that the defendant did not point the gun at the occupants of the white truck, threaten to shoot them, or ask them to stop. He said that the occupants could only see the pistol grip, if anything, because the gun was lying in the defendant's lap. Stallings admitted that the defendant told the occupants that if the occupants wanted to do something, such as fight, the defendant and Stallings were willing.

On cross-examination, Stallings testified that he and the defendant got into an argument with some men while at the carnival. He denied that he and the defendant were angry when they left the carnival. He stated that the defendant did not make any sexual remarks to the female passenger. He said that he planned on cursing the occupants of the truck, if the driver had called them racist names. Stallings testified

6

that he was trying to get away from the white truck when he accelerated and when he turned left off the street the second time. Stallings did not believe that the defendant had done anything wrong.

The defendant testified that he did not do anything wrong and asserted that he was trying to protect himself. He admitted that he owned a gun. He said that he bought the gun for protection because he had experienced problems with people in Alcoa and had received threatening mail. He stated that he did not know the victim or his wife and had never seen them or their vehicle. The defendant said that Jason Stallings was driving the truck on the night of the crime. He said that after he and Stallings left a carnival, they saw a man driving a white truck with a woman in the passenger's seat. He said that his gun was in the backseat of the truck and that the clip was in the glove compartment. He stated that Stallings cut in front of the white truck and that the truck pulled beside them as they were stopped at a traffic light. He stated that the man and woman began cursing them and making racist comments. The defendant testified that he did not say anything at this time. He denied that either he or Stallings was angry but asserted that he did not know how to react because he had never been called a racist name.

The defendant said that Stallings turned left off the road, but after the defendant told Stallings that they should go ask the driver what he said, they turned around to catch up with the truck. He stated that they drove beside the white truck and asked the driver what comment he had earlier made. He said that the driver repeated the name he had earlier called him and then repeatedly called them racist names. The defendant testified that he and the driver began arguing and cursing each other. He said that the driver leaned forward as he was arguing with the defendant. The defendant stated that because he did not know what the driver was doing, he pulled his gun over his right shoulder from behind the seat and sat it on his lap. He testified that

7

he also placed the clip beside the gun. He said that the driver then ran a red light and drove straight as he and Stallings were in the left turn lane. He stated that they were stopped by the police shortly after turning left off the street.

The defendant denied pointing the gun at the driver or making any threats to shoot him or damage his truck. He denied trying to scare the driver with the gun, and he believed that the driver did not see the gun. The defendant claimed that he placed the gun on his lap because he was scared that the occupants of the truck were going to do something to him. He stated that he did not intend to scare or hurt the occupants of the truck. He denied telling the driver to stop the truck. He conceded that he told the driver that if he wanted to do something, then he should do it. He also admitted that he was angry at the driver.

On cross-examination, the defendant testified that he was the type of person that was not scared of anyone and that he refused to allow anyone to tell him where he could go. He asserted that he removed the clip from the glove box just in case he had to put it in the gun, but he stated that he would not have put the clip in the gun or pointed it at the driver until he saw the driver grab a weapon. He said that he and Stallings followed the white truck only to find out what the occupants had said to them. The defendant believed that the driver of the white truck was intoxicated. The defendant denied that he acted arrogant when he was stopped by the police, and he explained that he was trying to keep his pants from falling down when he raised his hands in the air. He said that he told the police that he did not pull a gun on anyone. He stated that he told the officers that he did not know anything about the offense because he was not given any details regarding the victims or the truck involved.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to establish beyond a reasonable doubt that the defendant was the person who assaulted the victim. He argues that the victim identified the juvenile, Jason Stallings, as the person who pointed the gun at him. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Also, the identity of the defendant as the perpetrator of the crime was a question of fact for determination by the jury. <u>State v. Strickland</u>, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

In the light most favorable to the state, the evidence establishes beyond a reasonable doubt that the defendant was the perpetrator of the assault. The victim initially referred to the person who pointed the gun at him as a juvenile. However, the victim also testified that the person who asked him whether he had called him a punk, the defendant, was the same person who pointed the gun at him. He also identified the defendant at the police station and at trial as the individual who pointed the gun at him. Detective Manuel confirmed that the victim identified the defendant as the perpetrator of the assault. The victim's wife testified that the person who had the gun was the passenger. The defendant conceded that he was in the passenger's seat. Officer Wilson testified that the defendant got out of the passenger's seat of the truck when stopped by police. This evidence is sufficient to justify the guilty verdict.

9

Although not raised as a separate issue, the defendant also contends that Officer Wilson did not authenticate the gun introduced at trial as the one he retrieved from the truck in which the defendant was a passenger. He argues that the evidence should have been considered demonstrative evidence only given the victim's testimony that the gun merely looked like the gun the defendant pointed at him. However, the defendant failed to object to the introduction of the gun and failed to include the issue in his motion for new trial. Therefore, we hold that the defendant has waived the issue. "A trial court cannot be held in error when it is not given an opportunity to rule on an issue at an appropriate time during the course of the trial." State v. Walker, 910 S.W.2d 381, 396 (Tenn. 1995). In any event, the defendant admitted that the gun was his and that he had it with him when the offense took place. Under these circumstances, the gun was properly admitted.

## II. DENIAL OF FULL PROBATION

The defendant asserts that the trial court erred by denying full probation. He argues that given his overall achievements as demonstrated by his education and employment and given his lack of a serious criminal record, the defendant is not one for whom confinement is necessary. The state responds that the trial court properly sentenced the defendant. We agree.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may

not disturb the sentence even if a different result were preferred.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.  T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).  In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment.  T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

At the sentencing hearing, the defendant testified that he lived with his mother and grandmother.  The defendant denied pointing the gun at the victim or his wife and denied threatening them.  The defendant testified that he was enrolled in college but that he was unable to attend recently because he had mental problems causing him to be unable to concentrate.  He stated that he had attended classes when the trial took place but that he was unable to complete the courses because he had missed several days to be in court.  He said that he planned to take nine hours of

11

classes during the summer semester and that he had obtained financial assistance for his education. He stated that he planned to obtain a degree in electrical engineering. He said that he also worked approximately twenty-two to twenty-three hours a week cleaning the federal courthouse. A letter from the defendant's employer was introduced, and it reflects that the defendant is a responsible and reliable employee who makes a great effort at being punctual and completing his assignments with quality work. The defendant stated that medication had been prescribed for him in April 1996, because he suffered from depression. He said that he had been depressed for approximately two years. The defendant stated that the medication helped his depression by controlling his anger and impulses. The defendant admitted that he did not take his medication regularly when it was first prescribed.

The defendant testified that he had no prior felony convictions or assault convictions. He conceded that he had a prior misdemeanor conviction for carrying a weapon with the intent to go armed approximately one year before the present offense occurred. He explained that he had carried the gun because a couple of men from Alcoa had shot at his car. He also conceded that he had been convicted of illegally possessing alcohol and public intoxication. The defendant acknowledged charges of possessing brass knuckles. The defendant admitted that he violated curfew as a juvenile. He conceded that he used marijuana almost every day since the age of eighteen and that he had used alcohol approximately twice a week since the age of sixteen. He also admitted that he was drinking every day when interviewed for the presentence report. He said that the last time he used marijuana was in December 1996, and he also said that he had stopped drinking alcohol. The defendant denied that he had a drug or alcohol problem, and he said that he could abstain from using drugs or alcohol. He did not believe that he needed treatment for his drug and alcohol use. He conceded that he had consumed one beer at the time of the present offense, but he denied that he was intoxicated. The defendant testified that he had not gotten

12

into any fights and had stayed out of trouble since the offense occurred. The defendant stated that he no longer owned a gun.

The presentence report reflects that the defendant is a high school graduate and a student at a community college majoring in psychology. It showed that the defendant was employed part-time while attending college and was assigned to clean the federal courthouse. The defendant's supervisor reported that the defendant was a dependable worker. The report states that the defendant also had been employed at a couple of restaurants. It reflects that the defendant had no prior felony convictions but had a prior misdemeanor conviction for carrying a weapon with the intent to go armed. The defendant also conceded that he had been arrested for carrying brass knuckles. As a juvenile, the defendant was convicted of the illegal possession of alcohol. The presentence report states that the defendant reported that he had excellent physical health but fair mental health. He explained that he obtained psychiatric treatment in April 1996 after exhibiting a "paranoid, hostile, and violent attitude" at home. The defendant's psychiatrist confirmed that the defendant was easily angered and irritated and that he showed signs of severe depression. The defendant's psychiatrist stated that he prescribed medication for the defendant's condition, that he saw the defendant monthly, and that the defendant's condition had improved.

The presentence report reflects that the defendant admitted that he began drinking alcohol twice a week at the age of sixteen. The defendant conceded that his drinking increased during the summer of 1996, stating that he drank alcohol almost every day. The defendant believed that he could quit on his own but stated that he would go for treatment if ordered by the court. The defendant also admitted that he had used marijuana every day since the age of eighteen but that he had stopped using the drug in December 1996 because he knew that he would have to submit to a drug test. The report states that drug testing of the defendant was negative for drugs. The

13

defendant denied any other drug use, except for trying Valium a few years earlier. The presentence report reflects that the defendant had never obtained treatment for his substance abuse.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to four years, with the defendant to serve one month in the county jail followed by three years and eleven months of intensive probation. The trial court stated that it chose not to sentence the defendant to the custody of the Department of Correction but informed the defendant that he could be sent to the Department of Correction if he did not abide by the rules. The court noted the problems that carrying a gun involves and that the defendant had been in trouble for carrying weapons in the past. It found that although it could not determine who started the argument, both the victim and the defendant had said things to each other. It also stated that the defendant should not have responded by pulling out a gun and that he was lucky that nothing worse happened. The trial court determined that it would be a huge mistake to place the defendant on straight probation because of the defendant's continuing course of conduct. It held that one month of incarceration in the county jail was appropriate under the circumstances. The trial court required that the defendant go to college and work as a condition of his probation.

Initially, we note that the transcript of the sentencing hearing does not contain the arguments of counsel made in the trial court. In order to conduct a full de novo review, we must consider the arguments of counsel as to sentencing alternatives. T.C.A. § 40-35-210(b)(3). It is the defendant's obligation to prepare a fair, accurate and complete account of what transpired with respect to the issues raised on appeal. T.R.A.P. 24(b).

14

In any event, the record reflects that the trial court failed to state whether it presumed the defendant to be a favorable candidate for alternative sentencing. As a Range I, standard offender who has been convicted of a Class E felony, the defendant is presumed to be a favorable candidate for a sentence other than confinement, if there is no evidence to the contrary. See T.C.A. § 40-35-102(5) and (6). The presumption in favor of alternative sentencing may be rebutted if (1) "confinement is necessary to protect society by restraining the defendant who has a long history of criminal conduct," (2) "confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely commit similar offenses," or (3) "measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant." T.C.A. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. Crim. App. 1991).

Nevertheless, the trial court properly required that the defendant serve one month of his sentence in the county jail. We believe that some period of incarceration was necessary given the nature of the offense and the defendant's background. See T.C.A. § 40-35-103(1)(B). The defendant should not have been carrying a gun with him and should not have used it against the victim merely because he was angry at him for calling him racist names. The defendant had been in trouble in the past for carrying a weapon and should have known that the use of a weapon was not an appropriate response to the situation. Under these circumstances, a period of one-month incarceration is appropriate to avoid depreciating the seriousness of the offense to the defendant and to deter him from similar conduct in the future.

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge

15

CONCUR:

_____
Gary R. Wade, Presiding Judge


_____
David H. Welles, Judge

16